STATE *vs.* THOMAS FRANCIS SMITH, JR.

FEBRUARY 6, 1945.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

502

BAKER, J. Indictment for murder. In the superior court the defendant was found guilty of murder in the first degree by a jury. After the trial justice had denied a motion for a new trial, the defendant duly prosecuted his bill of exceptions to this court and the case is now before us on these exceptions.

By the indictment the defendant was charged with having murdered Angela Leccese, also known as Angela Smith, on January 16, 1943 in the town of Foster in this state. At this time it seems unnecessary to set out fully all matters disclosed by the evidence, the following general outline of the principal facts being sufficient to furnish an understanding of the questions raised herein.

From the evidence it appears that the defendant, who was born in Providence in 1900, had worked as a brakeman for the New York, New Haven & Hartford Railroad Company since 1920, in which year he had married Mabel V. Hopkins.

They had five children, and at the date set out in the indictment the defendant was maintaining a home for them and for her in North Providence. Generally he lived there with them, but for some time prior to January 16, 1943 he had resided in Providence. However no legal separation between the defendant and his wife was shown.

The defendant first met Angela Leccese, an unmarried woman, hereinafter referred to as Angela, or as the deceased, in the latter part of the year 1931 on a steamer operating between Providence and New York. She was approximately his own age and lived with her mother and sisters in Providence, being employed as a bookkeeper. Immediately thereafter the defendant and Angela met frequently and in a very short time they entered into an intimate relationship which continued up to the time of her death. On vacations, holidays and week ends they were in the habit of taking trips out of the state, holding themselves out on these occasions as man and wife. It appears from the evidence that soon after their first meeting she knew that the defendant was a married man with a family and she later met at least two of his children. From time to time they rented, as Mr. and Mrs. Smith, rooms in different houses in Providence so that they might unobtrusively continue their illicit relationship. About 1935 they rented for two years a camp in the western part of the state and subsequently one in the town of Scituate. These they visited often by means of the defendant's automobile. Finally, in April 1942, they purchased a camp in Foster taking title thereto as joint tenants.

About 1939 Angela and the defendant had some talk about his obtaining a divorce so that he could marry her, but he refused to do this, giving her as a reason his obligation to look out for his children while they were growing up. About this same time the evidence indicates that the defendant made some slight attempt to terminate their relationship, but without success. In the summer of 1940 Angela began to insist that, in spite of the existing situation, she and the defendant obtain a license and have a marriage ceremony

performed. The defendant objected strongly to so doing, being afraid of a bigamy prosecution, but thereafter at different times preliminary steps therefor, never however fully completed or carried out, were taken by them in localities in Vermont, Rhode Island and New Hampshire. Finally, in spite of the defendant's protest, they did obtain a marriage license in New Hampshire, the necessary blood tests having been made, and on September 28, 1941 they went through a marriage ceremony before a justice of the peace in that state. This ceremony was disclosed by Angela to her family in January 1942, and for some time thereafter the defendant lived openly with her at her family's house. On December 6, 1942 he rented a room at a house on Harvard avenue in Providence and Angela would go there every evening. At this time they discussed the desirability of buying a place of their own in which to live. Thereafter they looked at several houses with that end in view and early in January 1943 they examined a small new house in the town of Johnston.

On January 16, 1943 Angela arrived at the above-mentioned room about the middle of the afternoon and she and the defendant had something to eat. About four o'clock they left in his automobile to inspect the house in Johnston. After so doing they went, at Angela's suggestion, to the camp in Foster, arriving there at about five o'clock. It was cold and there was snow and ice on the ground. The defendant made a fire in the stove and he and Angela talked and had a little supper. About eight o'clock the defendant went to a house not far distant to obtain more wood for the fire, as the camp was chilly. Up to this point, according to his testimony, they were perfectly friendly. However, soon after his return with the wood, Angela made some reference to the fact that he had not kissed her. An argument followed and she charged the defendant with being too intimate with the woman who operated the house in Providence in which he had rented his room.

Apparently one word led to another and the argument became very heated. There is some conflict between the de-

fendant's testimony as given on the witness stand and his statements as contained in two confessions signed by him respecting the sequence and details of the events which then followed. However, it is admitted that the defendant struck Angela several times on the head with a metal shovel which was in the room and which he had been using to remove snow and ice from the entrance to the camp. As a result of these blows Angela finally fell to the floor, bleeding freely from severe cuts on her scalp. Not long after this termination of the quarrel, and about 11 p. m., the defendant extinguished the lights in the camp, locked the door and went out leaving her lying on the floor.

It appears from the evidence that Angela's family became alarmed the following day at her failure to return home. They brought that fact to the attention of the police in Providence and later also notified the state police at the Scituate barracks. Finally on the afternoon of January 18 the state police entered the camp, having obtained a key thereto, and found the dead body of Angela lying on its back on the floor. There was a large pool of blood on the floor near her head and also a considerable amount of dried blood on her head, face, hands and certain parts of her clothing. There was also a pillow almost entirely stained by blood on the floor near or under her head. A mattress, sheet and pillow, which were on a couch or single bed nearby, all showed a number of substantial bloodstains, and spots of blood were on portions of the walls of the room near the bed. The autopsy performed on Angela's body revealed, in addition to several minor abrasions, three deep cuts on her scalp and several fractures at the base of her skull. Her body when found was nearly drained of blood. The cause of death was testified to as excessive loss of blood, shock and multiple fractures at the base of the skull.

The evidence discloses that the defendant, after leaving the camp by automobile on the night of January 16, went to his home in North Providence and changed his clothes. Early the following morning he went to Boston on a freight

train, and from there left almost at once by train for New York where he visited his sister and brother-in-law. After staying with them for a few hours he returned by train to Providence, drew certain wages on the eighteenth which were due him, and after so doing went immediately to Brockton, Massachusetts, remaining there almost a week. He then went to Boston, took a train to New York and again visited his sister and brother-in-law. He learned from them that the police were looking for him, and on January 31 he gave himself up to the police in New York City, later returning voluntarily to this state.

Immediately after the jury were impaneled the state moved that they be taken to view the place where the alleged killing occurred. The defendant objected to this procedure, and the granting of this motion by the trial justice is the basis of the defendant's first exception. The defendant's objection was made on the grounds that he should not be compelled to give incriminating evidence against himself in violation of his constitutional rights; that as owner of the property in question he refused to give permission that it be entered for the purpose of having a view taken; and that if taken he would not have the benefit of a fair and impartial trial, because the presence of bloodstained garments in the room to be viewed and of profuse stains of blood on the floor and walls and on the couch would, unless covered in some way, so strongly prejudice and influence the jury against him that their minds would be made up before the evidence was presented, and thus they would be unable to exercise their independent judgment. In support of the motion the state contended that it was necessary for a proper understanding of the evidence that the view be taken.

Section 13 of article I of the constitution of this state reads as follows: "No man in a court of common law shall be compelled to give evidence criminating himself." In our opinion the granting of the state's motion to take a view of the premises in question was not, under all the circumstances appearing herein, in violation of any of defendant's consti-

tutional rights as to self incrimination. It is settled in this state that the object of a view is not to get evidence but is only to enable the jury to more clearly understand the evidence presented at the actual trial of the case. *State* v. *Germain,* 47 R. I. 269. It is our judgment that the above section was not intended to prohibit the granting of a motion made by the state that the jury merely take a view of the accused's premises where he is alleged to have committed the offense charged.

In respect to the second ground in support of defendant's first exception, it cannot be questioned that the common law has from ancient times given special protection and sanctity to one's dwelling, and has accorded such person certain rights and privileges under varying circumstances. It is in this connection that the expression that a man's house is his castle has often been employed. This general common-law right has been recognized by this court in several instances. See *Kelley* v. *Schuyler,* 20 R. I. 432. But no case has been called to our attention wherein a defendant, who is on trial for a crime alleged to have been committed by him on his own premises, was entitled to prevent a view thereof by the jury because of that ground, where a view is not considered as evidence and has been otherwise properly ordered by the court.

In the instant case it appears that the defendant had been placed on trial in a court of competent jurisdiction upon a valid indictment for murder alleged to have been committed by him on certain premises owned by him and the deceased as joint tenants. On motion of the state, under the statute hereinafter quoted, a view was ordered by the trial justice after a hearing and over defendant's objection based upon his alleged right of castle. The view as ordered and taken by the jury did not involve the invasion of premises owned by any disinterested third person. Under our decisions such a view is not taken for the purpose of getting evidence, but only to enable the jury to better understand the evidence; and it is not evidence in the constitutional sense. It is our

judgment, therefore, that the defendant's right to insist upon the protection and sanctity of his dwelling against unlawful entry does not extend to the situation as thus disclosed by the facts in evidence. We find that due enforcement of the law in the public interest should not be hampered or impeded by the defendant's insistence upon his common-law right and privilege respecting the sanctity and protection of his dwelling, which right and privilege, under the facts here presented, we deem to be subordinated to such enforcement. This conclusion, in our opinion, is consistent with certain of the pertinent general principles of law set out in *Semayne's Case,* 5 Coke, Fol. 91, p. 188 and in *State v. Smith,* 1 N. H. 346.

The defendant's third ground in support of his first exception is in substance that by reason of the bloodstained condition of the premises the jury would be so prejudiced against him that he would not receive a fair trial. A study of the law, both in this country and in England, relating to the taking of views under the common law is of historical interest but is otherwise not germane, since the matter is now regulated by statute in almost every state in this country. Our statute, G. L. 1938, chap. 508, §1, reads as follows: "In all cases in which it shall seem advisable to the court, on request of either party, a view by the jury may be ordered; and in all such cases the court shall regulate the proceedings at the view and in its discretion accompany the jury." It has been held that the ordering of a view under the authority of the above statute is discretionary with the trial justice. *State v. Germain, supra.* But when an objection on grounds other than those purely legal is made to a motion that a view be taken, the trial justice should not pass upon the motion *pro forma.* He should require sufficient information respecting its merits so that he may intelligently exercise his discretion in deciding whether it was reasonably necessary for the better understanding of the evidence, for the expedition of the trial and in protecting the rights of all interested parties. The burden of satisfying him that the taking

of the view at such time is reasonably necessary under all the circumstances is upon the moving party, in this instance, the state. On this point the present record is not as clear and complete as is ordinarily desirable.

In this connection the defendant's objection to the view was based on the ground of probable prejudice against him, by reason of the alleged gruesome condition of the premises to be viewed, and not on the ground that the view was unnecessary. But reference by the defendant, in opposing the motion, to the presence in the premises of bloodstained garments was very general and indefinite,'and the existence of a number of bloodstains on the floor, walls and bedclothes was not questioned. These, of course, were stains of dried blood, the view having been taken April 14, 1943, more than two months after the body of the deceased was found. The defendant also argued in the alternative that if the motion to take the view be granted, then the court should order that the stains be covered.

It may well be that the trial justice, in not accepting the defendant's suggestion as to covering such stains, felt that a view of the premises in an unchanged condition would enable the jury to better understand references in the evidence to the location, size and number of such stains, and to other matters connected with the premises themselves and the articles of furniture therein, than would a view of such premises in a changed position, as suggested by defendant. The trial justice did not grant the motion hastily, but took an appreciable time during a recess to consider it. We cannot say that, in ruling as he did, he clearly abused his discretion. In our opinion none of the grounds advanced by the defendant against the granting of the motion that a view be taken support his contention that there is reversible error. The defendant's first exception is overruled.

Exceptions numbered 2 to 20, inclusive, relate to rulings of the trial justice on evidentiary questions. In our opinion the defendant takes nothing by his second exception, which is to the exclusion of certain evidence, namely, a telephone

conversation, sought to be introduced by him in cross-examination of a state's witness. Aside from other considerations, the defendant made no offer of proof and we have no means of knowing whether or not such conversation was material and relevant and whether its exclusion prejudiced the defendant. This exception is overruled.

Exceptions 3, 4 and 5 may be considered together as they relate to the admission in evidence of an alleged confession of the defendant. He contends that while he was attempting to show that the alleged confession was not his statement, the trial justice unduly limited the cross-examination of a state's witness. When the alleged statement was offered by the state as the defendant's confession, a preliminary examination proceeded, in the absence of the jury, respecting the statement and the manner in which it was taken. Evidence was then brought out from the witness, who had charge of taking the statement, tending to show that it was made voluntarily and that it was not made because of threats, promises or inducements. No other witness was examined in this connection, and the defendant at that time offered no rebuttal testimony on that issue. On this showing and after the jury returned the trial justice admitted the confession in evidence, whereupon all the essential evidence connected therewith was then introduced before the jury.

In contending that the confession is not his statement the defendant apparently means that it does not contain in full all the details of a certain earlier interview between himself and an officer of the state police. Later in the trial the defendant, during the presentation of his own case, did as a matter of fact testify respecting his version of all matters connected with and appearing in said typewritten confession and of the earlier statements made prior to the taking and signing of that confession. We find that the trial justice did not limit defendant's attorney, during the preliminary examination concerning the voluntary character of the confession, in any matter that was pertinent, and that there

was no error in the rulings complained of under exceptions 3, 4 and 5. These exceptions are overruled.

The sixth exception is to the ruling of the trial justice in permitting Dr. Rounds, a witness for the state, to qualify as an expert and to give his opinion as to the cause of Angela's death. The defendant contends that the witness was not a medicolegal expert and was in fact not qualified to give an opinion on the above question. The record shows that the witness was examined at length as to his qualifications before he was permitted to express his opinion. It appeared, among other things, that he was not a doctor of medicine, but was a pathologist of some twenty-five years experience; that he had performed a great many autopsies; that he assisted in performing the autopsy on the body of Angela; that he is frequently consulted on pathological matters by doctors of medicine and asked to give opinions thereon; that he is assistant pathologist at the Rhode Island Hospital and is consulted by members of its staff; that at one time he was in charge of the laboratory of the state department of health; and that he has taken courses in pathology at the Harvard Medical School. The question before the trial justice was not whether the witness was qualified under the state statutes to practice medicine or to issue certificates; but solely whether he had the necessary knowledge and experience to qualify as an expert in the subject under consideration. The trial justice found that he was so qualified.

In this state it has been held that the competency of one offered as an expert is generally a question to be decided by the trial justice, and unless his ruling is palpably and grossly wrong it will not be reversed by the reviewing court. *Eastman* v. *Dunn,* 34 R. I. 416. Upon consideration we cannot say, in view of the record, that the ruling of the trial justice, in the present instance, was palpably and grossly wrong. The defendant's sixth exception is therefore overruled.

Exceptions 7 to 15, inclusive, and exception 20 have been examined and considered. In our opinion they do not require discussion. We find that none of them is a ground for

prejudicial error, and they are all overruled.

Exceptions 16 to 18, inclusive, relate to the admission in evidence, during the presentation of the state's rebuttal and over the defendant's objection, of three photographs. These exceptions will be treated together. Exception 16 is to a preliminary question directed to a state's witness and clearly has no merit. Exception 17 is to the admission in evidence of state's exhibit 19, and exception 18 is to the admission in evidence of state's exhibits 20 and 21, these exhibits being the photographs in question. Defendant's chief objection to their admission was that they were of a gruesome character and that they were being offered by the state merely for the purpose of prejudicing the jury against him. The state, however, denied this contention and took the position that although they might be of a disagreeable nature, nevertheless they were properly admitted in rebuttal as affecting the credibility of the defendant whose oral testimony differed somewhat from his explanation of events as made by him to the state police.

Exhibit 19 is a photograph of the top and back of the head of the deceased showing several extensive cuts and wounds thereon. Exhibits 20 and 21 are photographs of the upper part of her body showing her, as found by the police, lying on her back on the floor of the camp with one hand clenched and with considerable dried blood on her face and on certain parts of her clothing.

In the defendant's confession given to the state police after his final return to Providence he stated, in substance, that after a quarrel he struck the deceased on the head with a shovel while she was sitting or reclining on the couch or bed hereinbefore referred to. At the trial, however, he testified in general that during an argument Angela, who was several inches taller than he was, approached him holding a small hammer with which she struck him several blows on the hands and side; that he retreated several steps and told her to stop or he would strike her with the shovel; that she persisted in her conduct; and that, holding onto the metal

part of the shovel, he then swung it back and forth at her several times striking her across her forehead and on the right side of her head, and causing her to fall.

Exhibit 19, one of the photographs, was offered by the state as tending to rebut, by showing the nature and position of the wounds on the top and back of deceased's head, the defendant's oral testimony respecting the conditions under which and the manner in which the blows were struck, and as tending to show the improbability of his testimony in that regard, which differed from his statements to the police. Assuming that the exhibit was of a gruesome nature and might tend to unduly influence the jury, as defendant contends, it nevertheless was not inadmissible merely on that ground, if it was otherwise material and competent. Under the circumstances we are of the opinion that it was admissible in rebuttal of defendant's testimony. *State* v. *Miller*, 52 R. I. 440.

The defendant also objected to exhibit 19 on the ground that it appeared that the photograph was taken the morning after the body of Angela was found and at the place where the autopsy was to be held, and thus under changed conditions. In support of this objection he cites *State* v. *Baron*, 65 R. I. 313. It is our opinion, however, that the evidence in the *Baron* case and the lack of any proper foundation therein showed a situation sufficiently distinguishable from that disclosed by the evidence herein to make that case inapplicable. In the instant case the necessary preliminary foundations were laid before the photograph was offered as an exhibit. Under the circumstances we find that it was properly admitted.

The admission of exhibits 20 and 21 standing alone is not without some doubt; nevertheless, in view of the introduction of other photographs showing the deceased and of other facts in evidence, we are of the opinion that the error, if any, was not prejudicial. On the record therefore defendant's exceptions 16 to 18, inclusive, are overruled.

The basis for exception 19 is defendant's motion to strike out the evidence of the member of the state police, by whom the last two exhibits, *viz.*, 20 and 21, were identified, on the ground that their identification by him was not sufficient. The witness testified that he and another member of the state police, who was out of the state during the trial attending a national police school, together took a number of photographs of the camp and of the deceased's body, including the ones in question. While the witness was unable to state positively which one of them actually looked through the camera lens and manipulated the shutter of the camera when these two photographs were taken, he did testify that they were taken under his direction and supervision; that he assisted in their taking; and that they were correct and accurate representations of what they purported to show. Under these circumstances we are of the opinion that the trial justice did not commit error in denying the defendant's motion to strike out such testimony. This exception is therefore overruled.

Exception 21 was to that portion of the charge of the trial justice in which he told the jury to take under consideration a certain statement admittedly made by the defendant concerning his striking of the deceased with the shovel. The defendant argues that the trial justice unduly and erroneously emphasized this particular testimony, in that it was practically the only reference in his charge to the evidence in the case, citing *Pompei* v. *Cassetta,* 63 R. I. 74. In our opinion an examination of the part of the charge referred to does not resemble in any way the charge complained of and held to be erroneous in the *Pompei* case. The reference objected to in the present case was germane to a proper consideration by the jury of the issues involved and did not amount to overemphasis. The defendant's contention is not sound and this exception is without merit.

Under exception 22 defendant argues that the trial justice erred in refusing to grant certain of his requests to charge. It is well settled that a trial justice is not required to charge

in the exact language of a request although the law may be correctly stated therein. It is enough that he substantially and fairly cover the pertinent matters contained in such request. In our opinion request numbered 20 was properly refused since it did not fully and correctly state the law governing self-defense. The other requests now being pressed have been fully considered and we do not deem it necessary to refer to them individually.

The defendant apparently contends that in several instances the trial justice did not go fully enough into detail in relation to certain matters in evidence so as to bring them clearly to the attention of the jury, but only referred to them briefly, or not at all. The trial justice is not obliged in his charge to give a resumé of the evidence or to select for explanation any particular part thereof. In arriving at their verdict the jury is the sole judge of the facts. In the present case we find that the trial justice referred adequately to the factual issues so as to enable the jury to apply thereto the principles of law contained in his charge. In our judgment, the charge covers sufficiently the matters properly raised by the defendant in his requests now under consideration. Exception 22 is overruled.

The remaining exception is to the denial by the trial justice of the defendant's motion for a new trial based on the usual grounds. In a comprehensive rescript the trial justice fully approved the jury's verdict. It appeared from the evidence that the defendant admitted inflicting upon the head of the deceased at least two severe blows. While he intimated that she may have fatally injured herself in falling and striking the back of her head, there was no direct evidence to support such contention and his principal defense was self-defense. The jury, on the conflicting evidence, not only found against him on that issue, but also decided that he was guilty beyond a reasonable doubt of first degree murder.

There was evidence which, if believed, tended to show that the defendant and Angela were becoming more quarrelsome as time went on, and that the defendant was apparently

anxious to terminate their relationship, whereas she was anxious to continue it. The killing in this case was preceded by an argument and a quarrel. As bearing upon the presence in defendant's mind of malice and of premeditation prior to the killing for a sufficient length of time to support the verdict of first degree murder, there was evidence showing a threat by the defendant, while angry, to hit the deceased with a shovel; the picking up of that instrument by him after a lapse of some appreciable time; and then the striking therewith of not one, but repeated blows on her head, inflicting several very severe wounds. In that connection there was also evidence of the condition of the premises and of the deceased's body when found therein, all indicating the brutality and wantonness of the killing, and of the defendant's attitude in general, consistent with his consciousness of guilt. In reviewing the action of the trial justice we have examined the record and, upon consideration, we cannot say that he was clearly wrong in upholding the verdict of the jury and in denying the defendant's motion for a new trial. Such being the case, we do not disturb the verdict. This exception is overruled.

All of the defendant's exceptions are overruled, and the case is remitted to the superior court for further proceedings.

*John H. Nolan,* Attorney General, *John O. Pastore,* Asst. Atty. G., *John J. Cooney,* for State.

*Alfred J. Curry, William E. Walsh, Curry & Walsh,* for defendant.