### In re Emanuele Pilini

[173 A.2d 828]

May Term, 1961

Present: **Hulburd, C. J., Holden, Shangraw, Barney and Smith, JJ.**

Opinion Filed September 5, 1961

386

*Thomas M. Debevoise,* Attorney General, for the State.

*Richard E. Davis* for the respondent.

**Shangraw, J.** This is a presentment filed in this Court by the Attorney General of the State of Vermont, alleging that Emanuele Pilini, the respondent, since about August 1, 1956 has engaged in the unauthorized practice of law, and is guilty of contempt of this Court.

A special master was appointed by this Court and a hearing held. Thereafter there was filed a transcript of the hearing and the report and findings of the special master. No exceptions were taken to the report or findings.

The presentment contains three counts and generally alleges that the respondent, at Barre, Vermont, engaged in the unauthorized practice of law, stating details, by handling the financial affairs, under a debt pooling plan, for Edward and Pauline Chartier, Louis Parker and Robert Rielly.

The report and findings may be summarized as follows: The respondent is not an attorney. He formerly conducted a hardware business in Barre, Vermont. At times here pertinent he operated in Barre an "Agency of Service," which is so described on his business letterhead and detailed as encompassing "Financial Counsellor and Broker, Insurance Broker All Forms, Real Estate Management, Deputy Sheriff, Notary Public."

In August 1956, Edward Chartier, then being indebted to the respondent for merchandise which he had purchased of Mr. Pilini while the latter operated a hardware store, was hard-pressed financially and the respondent offered to help Mr. and Mrs. Chartier out of their financial difficulties. He stated to them that it would be necessary to have an assignment of Mr. Chartier's wages and that he could keep the creditors from "jumping them all the time." This assignment was given the respondent and on August 13, 1956 Mr. and Mrs. Chartier gave him a note of $1,857.00 secured by a mortgage on some furniture, a television set and their automobile. The consideration for this note and mortgage was that the respondent verbally agreed to take care of the bills owed by the Chartiers estimated at this amount. Before making this arrangement with the Chartiers the respondent consulted an attorney as to the propriety of this activity. The assignment, note and mortgage were prepared by the lawyer consulted.

Mr. Chartier turned over his weekly wages to the respondent. Mr. Pilini returned to him $20.00 weekly for living expenses and the remainder was paid to the creditors by the respondent. The respondent contacted the listed creditors, also attorneys representing some of the creditors, which arrangement at all times appeared satisfactory to them. For this service the respondent was to receive a commission of fifteen percent on money disbursed. This arrangement continued until December 1957 at which time it was terminated and the creditors so notified by the respondent. The respondent and the Chartiers then had an accounting and it was then agreed that the Chartiers were indebted to the respondent for services in the amount of $268.76, plus a Brown account of $41.15 paid by Mr. Pilini, a total of $309.91, which was to be amortized by weekly payments of $8.00. The mortgage dated August 13, 1956 was not discharged when the agreement was terminated but retained by the respondent as security for the agreed balance due him. The assignment of wages was released. The respondent later brought suit against the Chartiers on this claim.

During the course of this relationship, Mr. Chartier was subjected to litigation at the suit of a creditor named Brown. Acting under the respondent's instructions, Mr. Chartier brought the writ to the respondent's office. It appeared that, at the time of this suit, Mr. Pilini was a creditor of plaintiff Brown. The respondent settled the action against Chartier by crediting his account against Brown with the

amount of the claim as specified in Brown's action against Mr. Chartier and charging this credit against Chartier's account with the respondent. Part payment was later made to the respondent from Chartier's assignment of wages. It subsequently developed that the action of *Brown* v. *Chartier* was referred to Mr. Pilini's attorney in connection with the adjustment of accounts of the respondent against Brown.

In 1957 and again in 1959 the respondent handled the financial affairs of Louis Parker. Mr. Parker did not assign his wages to the respondent. However, he turned over to him his wages in excess of $15.00 weekly which were distributed by the respondent to the creditors and also applied on a freezer and food plan purchased by Mr. Parker from Mr. Pilini on April 4, 1958. This purchase was evidenced by a conditional sale contract written for $991.42. An accounting was made by the respondent to Mr. Parker upon the conclusion of this relationship, at which time Mr. Parker owed the respondent a balance of $532.75 on the freezer. Mr. Pilini charged 15% for this service. Mr. Parker later went into bankruptcy.

Beginning in 1956 the respondent handled the affairs of Robert Rielly under a debt pooling plan. At the suggestion of the respondent, Mr. Rielly gave him an assignment of his wages, having been advised by the respondent that "it would get all my debtors, (meaning creditors) off my back." During the period of this arrangement Mr. Rielly purchased of the respondent a freezer and food plan for around $1,000.00. That portion of the wages retained by the respondent was applied by him in favor of Mr. Rielly's creditors and on the debt owed by Mr. Rielly to Mr. Pilini. During the course of this arrangement Mr. Rielly gave the respondent a new conditional sale note of $675.00 on the same freezer, which was discounted at a bank by the respondent, the proceeds of which the respondent agreed to apply on the debts. This apparently was done.

It is evident from the record that Mr. Pilini learned of the financial difficulties of each of the three families through one of his other businesses—the Chartiers through a bill which they owed him for hardware; Mr. Parker by reason of a claim which the respondent had for collection in favor of the Puritan Company; and the Riellys through the Brown automobile note purchased by the respondent. The respondent was informed of the extent of their obligations and wages, and he advised them how to best handle their financial problems. He

advised the Chartiers and Mr. Rielly as to the legal effect of an assignment of wages in warding off creditors. Mr. Chartier and Mr. Rielly each discussed bankruptcy with the respondent. During these discussions the respondent in substance stated to them—why should you, or want to, go into bankruptcy? The respondent further stated to Mr. Chartier "You don't have to—why do you want to go into bankruptcy?" It is evident that the respondent became involved with the financial difficulties of the parties which concerned legal problems requiring the use of legal skill or knowledge.

The Attorney General urges that the respondent's activities in conducting the business of debt pooling, as evidenced by the record, presents features of the practice of law, and, viewed as a whole, amounts substantially to that.

Mr. Pilini testified that after the disposal of his hardware business his business activities consisted of "buying notes, mortgages, real estate, insurance, sheriff work, trust agent, accounts and collections for several companies, including the Puritan Company and others."

The general effect of the respondent's contention is that he had a right as agent to attempt the friendly collection of bills for creditors, provided that in doing so he did not resort to conduct directly or indirectly infringing upon the practice of law. This view has its support in the case of *In re Ripley*, 109 Vt. 83, 87, 191 A. 918. With this in mind he claims that by his activity as a debt pooler he merely was assisting the individuals involved in the payment of their debts, and that his activities as such did not constitute the practice of law. Debt pooling, as appears from the facts under consideration, differs from mere bill collecting by an agent named by a creditor to present a claim to a debtor and to receive payment. A debt pooler represents different interests, while a bill collector merely represents the creditor.

A well-founded criticism of debt pooling appears to be that a debt pooler owes his undivided loyalty to the debtor who retains his services and he cannot therefore at the same time properly be an agent for creditors. He cannot serve two masters.

Debt pooling, at least in some states, is a growing problem. Our study discloses that since 1955 twelve states have enacted prohibitory legislation relating to this subject. Section 218.02 of the Wisconsin statutes regulates companies engaged in such activities and places their regulation with the Commissioner of Banking.

Under the Wisconsin plan the Commissioner of Banking, before issuing a license, must find that the applicant qualifies as to financial responsibility, experience, character and general fitness.

■ We have no statute in this State governing debt pooling plans. Statutes may aid by providing machinery and criminal penalties governing certain business activities, but may not extend the privilege of practicing law to persons not admitted to practice by this Court. The latent danger in such a program is that there is such a strong likelihood of legal services or advice being involved where debtors find themselves in financial difficulties, or are defendants in various types of litigation and then seek assistance from a debt pooler, as was done in this case.

This is a case of first impression before this Court. We prefer to pass on the facts in each case rather than to unqualifiedly label debt pooling as unauthorized practice of law.

The crucial questions are: What constitutes the practice of law; and whether the acts of the respondent, of which complaint is made, or some of them, come within the definition of such practice. It is not easy to define the practice of law. The regulations with reference to attorneys have been very strict for centuries. *Re Carney,* 71 Vt. 501, 506. See *In re Monaghan,* 122 Vt. 199, 167 A.2d 81.

■ In considering this question it has been held that "It (practice of law) is not confined to performing services in an action or proceeding pending in courts of justice; but in a larger sense includes legal advice and counsel and the preparation of legal instruments and contracts of which legal rights are secured, although such matter may or may not be depending in a court." 49 C.J. 1315, citing *People* v. *People's Trust Co.,* 180 App. Div. 494, 496, 167 N.Y.S. 767; *Eley* v. *Miller,* 7 Ind. App. 529, 535, 34 N.E. 836; *Matter of Pace,* 170 App. Div. 818, 156 N.Y.S. 641, 646. Also see *In re Ripley,* 109 Vt. 83, 96, 191 A. 918; *In re Flint,* 110 Vt. 38, 41, 1 A.2d 718.

■■ Concerning this question it is held in Illinois that "practicing as an attorney or counselor at law, according to the laws and customs of our courts, is the giving of advice or rendition of any sort of service by any person, firm or corporation when the giving of such advice or the rendition of such service requires the use of any degree of legal knowledge or skill." *People ex rel. Ill. State Bar Assoc.* v.

*People's Stock Yards State Bank,* 344 Ill. 462, 176 N.E. 901, 907. See *In re Flint, supra,* at page 41. The practice of law includes "all advice to clients and all actions taken for them in matters connected with the law." *In re Duncan,* 83 S.C. 186, 189, 65 S.E. 210, 211, 24 L.R.A., N. S. 750, 18 Ann. Cas. 657. Also see *In re Flint, supra,* at page 41.

As bearing upon the question as to whether or not some of the acts of the respondent come within the definition of the practice of law we have here the legal consequences and effect of the Chartier note of $1,857.00 secured by a mortgage for which cash was not advanced and which mortgage and note were given to the respondent upon his advice. It is also apparent that the conditional sale note given by Mr. Rielly for security rather than representing a sale and purchase transaction was of doubtful validity. This conditional sale note was given also upon advice of the respondent. Mr. Chartier and Mr. Rielly were also advised by the respondent to assign to him their wages as a means to ward off creditors. Both Mr. Chartier and Mr. Rielly were in effect told that they did not have to go into bankruptcy.

The services which the respondent undertook to render his clients swiftly brought him and them in need of a lawyer's aid. The respondent recognized this fact and sought legal advice from members of the bar of the respondent's selection. The normal relation of attorney and client, with its incumbent duties of trust and confidence, was precluded. The legal assistance which the clients' predicament demanded was not personally communicated from the lawyer to the person in need of his professional skill and advice. Rather, it was relayed or channeled through the respondent without the restraint of professional standards. None the less, the respondent, through an intermediary, was practicing law in furnishing legal assistance and advice for compensation. See *Hexter Title and Abstract Co.* v. *Grievance Committee,* 142 Tex. 506, 179 S.W.2d 946, 157 A.L.R. 268; *In re Co-operative Law Co.,* 198 N.Y. 479, 92 N.E. 15, 16, 32 L.R.A., N.S. 55; *In re Otterness,* 181 Minn. 254, 232 N.W. 318, 73 A.L.R. 1319, 1322.

Furthermore, the respondent became engaged in the unauthorized practice of law in undertaking to handle the litigation instituted by Brown against Mr. Chartier. The transaction of this business on behalf of his client for compensation was a matter directly connected with the law and the courts. By so doing he performed · services

which could only be lawfully undertaken by a duly admitted member of the bar. *In re Flint,* 110 Vt. 471, 477, 8 A.2d 655.

██ We conceive that by advising his clients in the above particulars and in the manner as stated the respondent invaded the field reserved for duly licensed attorneys, and his conduct in giving this legal advice constitutes practicing law. Such unauthorized practice of law is a criminal contempt in this Court. *In re Ripley, supra* at page 87.

*The respondent is therefore adjudged guilty of contempt of this Court.*