**STATE**

v.

**Jose DOCTOR et al.**

**No. 95–566–C.A.**

Supreme Court of Rhode Island.

Feb. 19, 1997.

Aaron Weisman, Asst. Attorney General, for Plaintiff.

Mary E. Levesque, Middleton, Lise J. Gescheidt, Providence, for Defendant.

## OPINION

BOURCIER, Justice.

This case comes before us on the appeals of Jose and Alexis Doctor (Jose, Alexis or defendants) from judgments of conviction for murder, conspiracy, and two counts of assault with a dangerous weapon after a Superior Court jury trial. For the reasons set forth below, we deny the defendants' appeals.

## I

### Facts and Travel

On August 11, 1990, John Norman (Norman), Rodney Perry (Perry), Kimani Morris (Morris), Ronald Nelson (Nelson), Mark Ellis (Ellis), and Willie Davis (Davis) went to Sonny and Dennis', a club on the corner of Eddy and Globe Streets in Providence. Nelson was driving the car, Ellis sat in the middle of the front seat, and Davis sat on the front passenger side. Morris sat in the back seat on the driver's side, Norman sat next to Morris, and Perry was on the passenger side in the rear of the car. After patronizing Sonny and Dennis' for about one hour, they went to the River Cafe in the Fox Point section of Providence. They never actually entered the River Cafe, after having tried unsuccessfully to avoid paying a cover charge in order to gain entrance, but instead social-

ized outside for about a half hour. They thereafter returned to Sonny and Dennis'. When they arrived there, traffic was heavy around the area of Sonny and Dennis', and as a result the car in which the six men were traveling was stopped in front of the club. Suddenly three men appeared from behind the club and approached the car. One of the men, later identified as the defendant Alexis Doctor, ran to the passenger side, another, later identified as Jose Doctor, went to the driver's side, and the third, a juvenile, went to the front of the car. All three were carrying guns. The three men began shooting at the six passengers in the car and continued shooting for about five minutes. The gunmen then ran back to the rear of the club. As a result of the shooting, Davis was fatally shot in the head, and Perry was shot in the shoulder. Nelson then drove the car to Rhode Island Hospital, where the two injured men were taken inside for treatment.

On March 1, 1991, a Superior Court indictment was filed charging Jose and Alexis with four offenses: (1) the murder of Davis, (2) conspiracy with an unindicted juvenile to commit murder, (3) assault with intent to murder Nelson, and (4) assault with intent to murder Perry.[1] Their jury trial commenced in February 1992, but, after a state witness invoked his Fifth Amendment privilege in front of the jury, a mistrial was declared. A second jury trial commenced in March 1992. That trial resulted in convictions, but those convictions were reversed by this Court because the trial justice had improperly restricted the scope of defense counsel's cross-examination of a trial witness. *State v. Doctor*, 644 A.2d 1287 (R.I.1994).

A third trial, and the trial we are concerned with here, commenced in January 1995. At that trial Norman, testifying for the state, told the Court and jury that the area around Sonny and Dennis', where the shooting incident occurred, was well lighted by street lights and that he was able to see

---

1. Douglas "Junior" (Junior) was the alleged third gunman. A delinquency petition was filed against him in the Family Court because he was a juvenile. His conviction in that court on two counts of assault with intent to murder was reversed by this Court in *In re Douglas L.*, 625 A.2d

1357 (R.I.1993), for improper restriction of cross-examination for bias or motive. Alexis Doctor was also a juvenile when the crimes in question occurred, but he was waived out of Family Court after hearing.

the gunmen as they approached the car. He testified that he recognized them as Jose and Alexis Doctor and Junior. He testified further that he knew Jose and Alexis for some three to four years and knew Junior for about one year. He remembered that the gunmen were wearing "hoodies," oversized hooded sweatshirts. He also testified at trial that just before the gunmen began shooting, he heard Alexis Doctor say, "[W]here is my brother, Shit, at?" He then estimated for the jury that the shooting went on for about five minutes and that the three gunmen then ran back to the rear of Sonny and Dennis'. Norman, at that time, noticed that Davis and Perry had been shot and accompanied the other occupants of the car when they brought Davis and Perry to Rhode Island Hospital. Norman did concede that he never actually saw Jose Doctor fire the weapon Jose was carrying at the time of the shooting.

When the police first questioned Norman about the incident, he denied having any relevant information about the shooting, but he later provided the police with his eyewitness account. That police statement was consistent with his testimony given at the March 1992 trial as well as his testimony given at the January 1995 trial at issue herein.

Another witness testifying for the state was Vicky Brown Strong (Strong), the sister of the mother of the decedent Davis. Davis's mother is a deaf-mute, and as a result Strong had a close relationship with her sister and often assisted her in communicating with other people. Strong and Davis's mother were able to communicate through sign language.

Strong testified that on August 11, 1990, a Saturday night, she had been socializing with some friends outside a house at 275 Rhodes Street. She testified that while socializing, she had drunk two wine coolers and had smoked marijuana but that notwithstanding she was still "very positive" about her recollection of the events that occurred on the night in question. She recalled that when she arrived at Rhodes Street at about 7 or 8 p.m., Alexis was already there. Soon thereafter Junior and Jose arrived at the social gathering independently of each other. She appeared slightly confused in her testimony

when questioned about the exact times of the arrival of Junior and Jose. However, she had no difficulty in recalling that when Junior arrived, he began talking to Alexis and then they showed each other their guns. She recalled also at one point that when Jose drove to the house on Rhodes Street, he was wearing a black, hooded sweater. She also recalled seeing him reach into the back seat of the car he was driving to obtain a gun. She testified that Jose, Alexis and Junior then left together in a car belonging to Junior. Strong testified further that, as the three men were leaving the gathering at Rhodes Street, she heard Alexis say to Jose and Junior, "[L]et's go do this."

Strong then testified that Jose and Alexis returned to Rhodes Street some forty-five minutes later, and that Junior was not with them. At that time she saw Jose and Alexis run out of and from Junior's car and run into Jose's car. She testified that Jose was running "like he was scared to death" and that Alexis, running with gun in hand, was "jumping up in the air hollering 'Yeah, Yeah'" and "Fuck that nigger, Fuck that nigger."

Strong found out later that night that her nephew, Davis, had been shot. She went to Rhode Island Hospital with her daughter and niece at about 1 or 1:30 a.m. She claimed that she tried to give a statement to the police at the hospital but that no one wanted to talk to her. She testified that, in fact, the police had harassed her and had pushed her away.

Strong did not testify at any of the two previous trials or at any preliminary hearings, perhaps, in part, because she had never given a statement concerning the events to the police. She testified that the reason she had never testified at any of the prior trials or hearings was because she was often out of town with her boyfriend, a truck driver, during the pendency of the earlier hearings and trials. However, she testified that at one point she did attend a Family Court hearing concerning Alexis. After being shown, on cross-examination, a report from the Department of Children, Youth and Families (DCYF) that confirmed that she had spoken to a DCYF officer in February or March 1992, at or about the time of the second trial,

she acknowledged that she had also attended one or two Superior Court hearings, but that she had been asked to leave the courtroom. She was never called to testify as a witness, however, at any of those hearings.

Nelson was also called to testify for the state. He proved to be a highly uncooperative witness and testified that he did not know who the gunmen were. He explained to the jury that his prior statement to the Providence police, his prior statement given at a September 1990 bail hearing, and a prior statement he had given at Alexis's Family Court waiver hearing, all of which identified Jose and Alexis as two of the gunmen, were all incorrect. He told the court and jury that "I could have told them [the police] anything. I am a convicted felon. I'm the corruptest person you ever wanted to meet. I will tell you anything."

As part of the state's case, Walter Williams (Detective Williams), a detective in the Bureau of Criminal Identification of the Providence police department, testified that in the early morning hours of August 12, 1990, he found three shell casings from a .45–caliber semiautomatic weapon around the vicinity of Sonny and Dennis'. He testified that he also found some 9–millimeter live ammunition on Eddy Street and on the corner of Eddy and Globe Streets. He further testified that after searching around Sonny and Dennis', he went to Rhode Island Hospital where he recovered a .38–caliber projectile. The next morning, he said that he retrieved two .45–caliber projectiles from the driver's door of the car in which the six men had been traveling on the night of the shooting. A .38–caliber projectile was found in Davis's body during his autopsy. Detective Williams conceded while testifying, however, that he could not be certain that all the casings that he found in the vicinity of Sonny and Dennis' came from the shooting incident in question, because the corner of Eddy and Globe Streets was and is, generally, a high crime area.

Richard Wilkinson, a ballistics expert and an employee of the State Crime Laboratory, also testified. He told the jury that the .38–caliber projectiles collected by Detective Williams were fired from the same gun and that the .45–caliber projectiles collected by Detective Williams were also fired from the same gun but not the gun from which the .38–caliber projectiles had been fired. He testified that it was not possible to fire a .38–caliber projectile from a .45–caliber weapon or vice versa.

The former Chief Medical Examiner's testimony, given by him at the first trial, was read into the record, by stipulation of the parties. That prior recorded testimony described the location and the type of injuries sustained by the decedent, Davis, and concluded that Davis's wounds were consistent with those from a bullet fired from a distance of at least three feet.

Testifying for the defense for the purpose of impeaching Strong's earlier testimony was Keith Tucker (Sergeant Tucker), a sergeant with the Providence police department assigned to Internal Affairs. Sergeant Tucker told the jury that the only complaint ever filed by Strong with the department was in an unrelated matter, and that he had no record of any complaint ever having been filed by Strong relating to the murder of Davis or the allegedly hostile treatment that she claimed she received from the police at the hospital when she went to see Davis.

Ellis, one of the passengers in the car in which Davis had been shot, was also called by the defense. He testified that he had drunk alcohol, smoked marijuana, and had taken mescaline at Sonny and Dennis' on the night of the shooting. He testified further that he did not see who shot at the car and that he did not see Jose or Alexis on the night in question. He described the gunmen who did the shooting as wearing "hoodies" that covered their faces. Ellis had never been called to testify in any of the previous trials and, in fact, had never given a written statement to the police, although he did say that he had been questioned by the police while at the hospital on the night Davis was shot.

The defendants, Jose and Alexis, both testified in their own defense. Jose testified that on the night in question, he had gone to Rhodes Street where Strong was socializing with her friends but that he left there some

time around 8 or 9 p.m. to go to McDonald's. He told the jury that after he returned home after getting something to eat at McDonald's, he changed his clothes and then went to Sonny and Dennis' at about 10 or 10:30 p.m. He had a beer at Sonny and Dennis' and left there after a half hour to forty-five minutes. He told the jury that he then went home and went to bed at around 11:30 p.m. or midnight. He also testified, contrary to Strong's testimony, that Junior did not own a car, which, according to Strong, was the very vehicle in which all three alleged gunmen had driven away in from Rhodes Street. However, Jose corroborated Strong's testimony regarding his own car, a yellow Cutlass, thereby lending additional support to her testimony.

Alexis testified that he went to Rhodes Street at around 3 or 4 p.m. and left there at around 7 p.m. so that he could visit with friends on Laura Street in Providence. He further testified that he arrived home at around 10 p.m. Alexis noted that when he arrived home, he believed his brother, Jose, was already there. He conceded, however, that Jose's room, which was located in the basement of the house, had a separate entrance from the rest of the house so that Jose could enter and leave his room without having to go through the main part of the house.

At the conclusion of the defendant's trial, the jury returned guilty verdicts against the defendants on the murder and conspiracy charges and on the two counts of assault with a dangerous weapon. They thereafter moved for a new trial on the basis of newly discovered evidence. A hearing on those motions was held on February 14, 1995. At that hearing, Norman, the primary witness for the state at trial, recanted his trial testimony in which he had identified the defendants as the gunmen. He told the motion justice that he had been told by Morris, now deceased, that Alexis and Jose were the gunmen but that he did not actually see the gunmen himself. Despite Norman's recantation, the trial justice denied the motions for new trial. The trial justice characterized Norman's recantation testimony as "totally and utterly fabrication." He further found

that the defendants' testimony amounted to "foolish stories." The trial justice concluded, therefore, that Norman's testimony at the trial, when coupled with Strong's testimony and the unbelievable testimony given by the defendants, clearly warranted the jury's verdict. He consequently denied the defendants' motion for new trial.

At their sentencing, each of the defendants was sentenced to life imprisonment on the murder charge, ten years to serve, but suspended, with ten years' probation on the conspiracy charge, and five years to serve, but suspended, with five years' probation on each of the two assault charges. The suspended sentences and probationary terms were imposed to run consecutive to the life sentences. Both Jose and Alexis appealed.

## II

### Cross-Examination on Bias

■ The defendants in their appeal raise two claims of error. They claim, initially, that the trial justice erred in prohibiting the defense from pursuing its cross-examination of Strong on the issue of her bias and motive for testifying as she did. They posit that Strong was aware of a civil suit filed by Davis's mother pursuant to the Criminal Injuries Compensation Act, G.L.1956 chapter 25 of title 12(act). They offer or suggest to us, however, no evidence from the record that indicates or even permits the inference that Strong's testimonial denial of having any knowledge about her sister's civil suit was anything but truthful. At trial, defense counsel sought to cross-examine Strong in regard to whether she thought that a conviction was a necessary prerequisite for her sister to recover in that civil suit, ignoring, of course, Strong's earlier denial of having any knowledge of that civil suit. Although the language of § 12–25–3(f) clearly precludes the necessity of a conviction before recovery, the defendants at trial apparently believed that if they could show that Strong did know of her sister's civil suit and also that she believed that the defendants' convictions were a necessary prerequisite for recovery in that civil suit, those combined facts would then be a sufficient basis for causing Strong to be untruthful in her testimony. In refus-

ing to allow such cross-examination, the trial justice noted that the act does not, by its terms, require any conviction. He explained further to defense counsel that he was going to terminate counsel's questioning of the witness about her sister's civil suit because the witness had answered, "[N]o, I don't know," in response to the defense counsel's question "[H]as she communicated to you what, if anything, she's going to do about this incident? * * * [W]hat she's going to do with—about this case?" We agree with the trial justice's ruling.

▇▇▇▇ "Effective cross-examination is an essential element of the presentation of a full and fair defense and is guaranteed by both the State and the Federal Constitutions." *State v. Veluzat,* 578 A.2d 93, 94 (R.I.1990). Moreover, "the cross-examiner must be given a reasonable opportunity to explore and to establish any possible bias, prejudice, or ulterior motive that a witness may possess that might affect the witness' testimony." *Id.* at 94–95 Nevertheless, "the scope of cross-examination, even for the purpose of exposing bias [or motive], is not unlimited. Limiting the extent and scope of cross-examination is within the sound discretion of the trial justice, and any such ruling by a trial justice will be left undisturbed by this court absent a showing of clear abuse of that discretion." *Id.* at 95. Although some limitation of the extent and the scope of cross-examination is permissible, in order to ensure that the defense receives a fair trial, the trial justice must permit "reasonable latitude" on cross-examination, including "an opportunity for a defendant to establish or reveal possible bias, prejudice, or ulterior motives as they may relate to the case being tried." *State v. Anthony,* 422 A.2d 921, 924 (R.I.1980). Such reasonable latitude was certainly provided to the defendants' counsel in this case.

The defendants here were clearly afforded full opportunity to inquire about whether Strong had any knowledge of her sister's civil action brought under the Criminal Injuries Compensation Act. Strong was specifically asked by defense counsel whether Strong's sister had "communicated to * * * [her] what, if anything, she's going to do about this incident? * * * [W]hat she's going to do with—about this case?" Strong, however, had responded, "[N]o, I don't know." The trial justice's decision to terminate the inquiry concerning her sister's pending civil action at that point was proper. The trial justice did not abuse his discretion in limiting defense counsel from further cross-examining the witness Strong about a matter that she testified she had no knowledge of. No case law has been presented that supports such pointless continued cross-examination and we hesitate to create it in this case.

Defense counsel had certainly been given ample opportunity to explore for any signs of bias in the witness. If, notwithstanding, he believed that he had not adequately exhausted his opportunity to do so, he certainly could have indicated to the trial justice just what he was digging for but could not unearth. An offer of proof pursuant to Rule 26(b) of the Superior Court Rules of Criminal Procedure was available to him. Instead, however, defense counsel simply informed the trial justice that the court could not "require" him to make an offer of proof on cross-examination pursuant to *State v. DeBarros,* 441 A.2d 549 (R.I.1982), thus effectively refusing to assist the trial justice by making an offer of proof. We acknowledge defense counsel's reliance upon *DeBarros,* and its clear support for counsel's refusal. Rule 26(b), which had been adopted some ten years earlier,[2] is not opposite *DeBarros.* Rule 26(b) *permits* offers of proof, but does not mandate such offers. In this case, however, the trial justice obviously believed that defense counsel had been given adequate opportunity to cross-examine on the possible bias of the witness. Had an offer of proof been made, we would now certainly be in a better position to determine therefrom whether the trial justice had abused his trial-control discretion in terminating defense counsel's further questioning on that issue. If the trial justice was unable to see the need for any further cross-examination on the bias issue, we on review are less able to do so in the absence of an offer of proof from counsel or some indication in or from the record of

---

2. Effective September 1, 1972.

where the continuing questioning might eventually have led. If that direction had been indicated, the trial justice might then have been alerted to information not otherwise available to him and he might very well have then permitted defense counsel to continue his inquiry. If counsel did not want to expose his intended area of further cross-examination to the ears of the witness, he certainly could have requested a sidebar conference, out of the hearing of the witness, where a record of his offer of proof could have been made and preserved for later review.[3] *See, e.g., State v. Kasper,* 137 Vt. 184, 404 A.2d 85, 94 (1979); *Abbadessa v. Tegu,* 122 Vt. 338, 173 A.2d 153, 156 (1961). Absent that offer of proof, or some indication on the record of what counsel believed that he could unearth, we are unable to perceive any abuse of discretion in the trial justice's ruling.

Offers of proof in criminal trials during cross-examination have been recognized in our state trial courts. *See, e.g., State v. Crescenzo,* 114 R.I. 242, 251–52, 332 A.2d 421, 427–28 (1975); *State v. Jefferds,* 91 R.I. 214, 217, 162 A.2d 536, 538 (1960); *State v. Mandella,* 79 R.I. 476, 479, 90 A.2d 423, 425 (1952); *State v. Smith,* 70 R.I. 500, 509–10, 41 A.2d 153, 157–58 (1945); *State v. Van Osten,* 68 R.I. 175, 180–81, 26 A.2d 858, 861 (1942). In our Rules of Criminal Procedure, effective September 1, 1972, provision therein is made for offers of proof. Although the rule does not explicitly state that offers of proof may be made during cross-examination, neither does the rule limit offers of proof to questions posed during direct examination.[4] It appears clear to us that even though *Calci v. Brown,* 95 R.I. 216, 186 A.2d 234 (1962), decided some ten years prior to Rule 26(b), does state that "[a] trial court may not properly require offers of proof with respect to inquiries made during cross-examination except in some unusual and peculiar circumstance," 95 R.I. at 220, 186 A.2d at 236 (citing *Fahey v. Clark,* 125 Conn. 44, 3 A.2d

313 (1938)), Justice Kelleher some thirteen years later, and after adoption of Rule 26(b), made clear that offers of proof on cross-examination were encompassed within the rule. *State v. Crescenzo,* 114 R.I. 242, 332 A.2d 421 (1975). In *Crescenzo* the trial justice had expressed doubt that an offer of proof was proper during cross-examination. Justice Kelleher, in footnote response to that trial justice's doubt, noted:

> "The trial justice referred to *Calci v. Brown,* 95 R.I. 216, 186 A.2d 234 (1962), where the court ruled that ordinarily offers of proof during cross-examination were not required. However, both the Superior Court's Rules of Civil and Criminal Procedure *permit an attorney to make an offer of proof in any instance* where an objection to his question is sustained. Super. R. Civ. P. Rule 43(c); Super. R.Crim. P. Rule 26(b)." 114 R.I. at 252 n. 1, 332 A.2d at 427 n. 1. (Emphasis added.)

Absent that offer of proof or some indication from counsel on the record in regard to what might have developed from his continued questioning of the witness Strong, there appears to have been no evidence before the trial justice from which he might have concluded that continued questioning by defense counsel or a "voir dire" of the witness would have produced any additional probative evidence from her that would have been of any assistance to the defendants.

As was aptly put by Justice Kelleher, "a fishing expedition on cross-examination may properly be brought to a halt when it becomes obvious that the pond is devoid of fish." *State v. Brennan,* 527 A.2d 654, 657 (R.I.1987). When Strong answered defense counsel's inquiries in the negative, the pond was deemed empty and defense counsel had opportunity to then either tell the court where he believed the fish were hiding or to pack up his fishing gear and try elsewhere. Defense counsel, however, elected not to in-

---

**3.** We note that the discussion between the trial justice and defense counsel regarding the offer of proof did, in fact, take place at a sidebar conference.

**4.** Rule 26(b) of the Superior Court Rules of Criminal Procedure provides in pertinent part

that "[i]n an action tried by a jury, if an objection to a question propounded to a witness is sustained by the court, the examining attorney may make a specific offer of what he or she expects to prove by the answer of the witness."

form the trial justice whether he believed there were any fish in the pond. Accordingly, there was no abuse of discretion in the trial justice's ruling limiting the cross-examination of Strong about what she might have believed regarding the sister's civil action, of which the witness testified she was unaware. The defendants' claim of error is without merit.

## III

## Motions for New Trial— Recanted Testimony

The defendants' second claim of error is that the trial justice should have granted the defendants' motions for new trial because of the witness Norman's recantation of his previous trial testimony. We disagree.

■ On a motion for new trial,

"a trial justice, as he considers the pros and cons of such a motion, acts as a 'super juror' or a 'thirteenth juror' in that he makes an independent appraisal of the evidence in the light of his charge to the jury. He can weigh the evidence and assess the witnesses' credibility. He can reject some evidence and draw inferences which are reasonable in view of the testimony and evidence in the record. After he finishes his sifting of the evidence, the trial justice must make a choice. He can * * * follow the route designed for times when he thinks the testimony so evenly balanced that the verdict should not be disturbed, or he can go the way established for those occasions when his 'superior judgment' tells him that the verdict is against the preponderance of the evidence and thereby fails to either do justice to the parties or respond to the merits of the controversy. If he determines that the evidence presented an 'evenly balanced-reasonable minds could differ' situation, he denies the motion. On the other hand, if he is of the opinion that the verdict is not a proper response to the evidence, he grants the motion." *Ruggi-*

*eri v. Big G Supermarkets, Inc.*, 114 R.I. 211, 215–16, 330 A.2d 810, 812 (1975).

■ Once the trial justice has decided whether to deny or to grant a motion for new trial, we will not second-guess that decision "unless the decision is clearly wrong or unless the trial justice, in reviewing the evidence, overlooked or misconceived relevant and material evidence." *State v. Estrada*, 537 A.2d 983, 986 (R.I.1988). "When ruling on a motion for a new trial, the trial justice need not refer to all the evidence supporting the decision but need only mention sufficient evidence to allow this court to discern whether the appropriate standard was applied." *State v. Dame*, 560 A.2d 330, 333 (R.I.1989).

■ The trial justice in this case clearly and coherently set forth his reasons for denying the defendants' new trial motions. With regard to Norman's new trial recantation testimony that Morris, his now-deceased friend, had told him that the defendants were the perpetrators but that he had no personal knowledge himself of who the perpetrators actually were, that recantation testimony was found by the trial justice to be "totally and utterly fabrication." The trial justice explained further that he did not "believe a word of" Norman's recantation testimony and noted that Norman on three prior occasions had given statements that were in direct contradiction to his recantation testimony. Those three prior occasions were Norman's police statement, Norman's testimony at the March 1992 trial, and Norman's testimony at the trial concerned in this appeal.

With particular reference to our evaluation of the trial justice's rejection of Norman's new trial hearing recantation testimony, we note Norman's testimony given during cross-examination by the prosecutor:

"Q We know. We know you don't want anything to do with it; that is why you're here today, right?
"A Yes, sir.
"Q Try to wash your hands clean of this whole thing?
"A Yes.
"Q Save your face with these two guys?
"A Yes, sir."

That series of questions and answers clearly points out that Norman was recanting his

testimony for reasons other than desiring to correct any inaccuracy in his prior trial testimony.

Moreover, the details noted by Norman during the course of his trial testimony, lends further support for its then accuracy and the later falsity of his recantation testimony. Norman admitted during his trial testimony that he never actually saw Jose shoot his gun, which statement was consistent with his testimony at the March 1992 trial. If his trial testimony had in fact been false and intended to convict the defendants for the shooting of Davis at Sonny and Dennis', he would have certainly concocted a more elaborate story in order to ensure that Jose and Alexis would be convicted. By testifying as he did, that he never saw Jose shoot his gun, he was certainly not trying to inculpate the defendants.

▇ Additionally, the trial justice clearly understood his role as the "super" thirteenth juror and he applied the proper standard when examining and reviewing the trial evidence in the record. He painstakingly pointed out that, notwithstanding Norman's recantation, there was more than sufficient other credible evidence in the trial record that actually supported Norman's testimony given at trial, specifically, Strong's testimony that established that Jose and Alexis and the third gunman had left the house on Rhodes Street with guns and that when Alexis returned to the house with Jose a short time before Strong learned that her nephew had been shot, he was screaming with elation about how they had just "fucked up some niggers." The trial justice also noted that the defendants themselves had testified and that, by testifying, they had assumed the risk that the jury could disbelieve and reject their testimony and, in fact, could draw an adverse inference from their rejected testimony if "there exist[ed] some other evidence of the

defendant's guilt," *State v. Mattatall,* 603 A.2d 1098, 1109 (R.I.1992), as they did in this case.

"A trier of fact is not compelled to accept and believe the self serving stories of vitally interested defendants. Their evidence may not only be disbelieved, but from the totality of the circumstances, including the manner in which they testify, a contrary conclusion may be properly drawn." *Id.* (quoting *United States v. Cisneros,* 448 F.2d 298, 305 (9th Cir.1971)).

Furthermore, despite Norman's allegations both in a letter written to his cousin after the March 1992 trial [5] and while testifying at the hearing on the new trial motions that he was forced to testify as he did, there was no independent evidence in the record to support his claim other than his own conclusory assertions. Norman's allegations that he was forced to testify at the March 1992 trial, that the prosecutor told him that he could not invoke his Fifth Amendment privilege, and that it was Norman's personal belief that he would get an extra two years in jail if he did not testify, were totally unsupported by anything in the trial record and were rejected outright by the trial justice. Norman carefully avoided singling out just who did coerce him into testifying and, instead, in order to avoid being confronted by rebuttal, simply referred to those responsible as being the police, the prosecutor, his deceased friend Morris, or "some other guys." [6]

We are satisfied that the trial justice quite perceptively and correctly evaluated Norman's trial testimony as well as his recantation testimony given at the defendants' hearing on their motions for new trial. He concluded that Norman's trial testimony was truthful but that his new trial recantation testimony was nothing more than his perjurious attempt to help the defendants get away with murder. We conclude no error

---

**5.** That letter stated, "Yo cause about me testifying against Jose and Alexis. Yo I swear to God nigga the fucken State made me do it."

**6.** It is interesting to note that Nelson, one of the other six men in the car, was a highly recalcitrant witness for the state at both the March 1992 and the January 1995 trials, but in his police statement, his testimony at a bail hearing,

and his testimony at a Family Court waiver hearing, he recounted a story materially consistent with Norman's trial testimony. Oddly, however, he, like Norman at the hearing on the new trial motions, lost all relevant personal recollection of the events on the night in question by the time he was called as a witness at the March 1992 and January 1995 trials.

in that finding, and we are satisfied that the trial justice's decision on the defendants' motions for new trial is without error.

## IV

### Conclusion

For all the above reasons, the defendants' appeals are denied and dismissed, the judgments of conviction are affirmed, and the papers of the case are remanded to the Superior Court.

WEISBERGER, Chief Justice, concurring.

I am generally in agreement with this opinion. However, I cannot agree with the implied criticism of the doctrine enunciated in *State v. DeBarros*, 441 A.2d 549 (R.I.1982), regarding the lack of requirement that a cross-examining defendant need make an offer of proof in order to overcome the sustaining of an objection if he or she is exploring bias. Rule 26 does not purport to discuss offers of proof on cross-examination. The language concerning offers of proof is general and should properly apply to direct examination. There is no indication that the drafters of the rule intended to change the rules of evidence as enunciated in 1 *McCormick on Evidence*, ch. 6, § 51 at 197 n. 10 (Strong 4th ed. 1992).

> "On cross-examination, the examining counsel is ordinarily assumed not to have had an advance opportunity to know what the witness will answer, and the requirement of an offer will not usually be applied. * * * Even on cross-examination the court in its discretion may require counsel to hint his purpose far enough to show the materiality of the answer hoped for, or enough must be made to appear so that error will be indicated upon appeal." *Id.*

Moreover, it should be noted that *DeBarros* followed the doctrine enunciated in *Alford v. United States* in which the following comment was made:

> "Cross-examination of a witness is a matter of right. *The Ottawa*, 3 Wall. 268, 271 [18 L.Ed. 165]. Its permissible purposes, among others, are that the witness may be identified with his community * * * and that facts may be brought out tending to

discredit the witness by showing that his testimony in chief was untrue or biased.

> "Counsel often cannot know in advance what pertinent facts may be elicited on cross-examination. For that reason it is necessarily exploratory; and the rule that the examiner must indicate the purpose of his inquiry does not, in general, apply. It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop." *DeBarros*, 441 A.2d at 551 (quoting *Alford v. United States*, 282 U.S. 687, 691–92, 51 S.Ct. 218, 219, 75 L.Ed. 624, 627–28 (1931)).

We also cited *Calci v. Brown*, 95 R.I. 216, 220, 186 A.2d 234, 236 (1962), for the proposition that a cross-examiner may not ordinarily be required to make an offer of proof. 441 A.2d at 551.

In any event, with the advent of *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the right of cross-examination on bias became constitutionally entrenched. I recognize that our older cases were not uniform on this issue. *State v. Henderson*, 71 R.I. 219, 225, 43 A.2d 327, 330 (1945), dealt with an offer of proof on direct examination, not cross-examination. *State v. Smith*, 70 R.I. 500, 509–10, 41 A.2d 153, 158 (1945), did deal with a question asked on cross-examination. *State v. Jefferds*, 91 R.I. 214, 217, 162 A.2d 536, 538 (1960), *overruled on other grounds* by *State v. Johnson*, 119 R.I. 749, 770, 383 A.2d 1012, 1023 (1978), dealt with the advancement by the defendant of a new rule of criminal responsibility. In that case the court recommended that an offer of proof might have been made in respect to other tests. This offer of proof would have been in aid of direct examination (which never took place). *Id. State v. Van Osten*, 68 R.I. 175, 180–81, 26 A.2d 858, 860–61 (1942), did deal with a question asked on cross-examination of a police officer, and the absence of an offer of proof was noted.

All these cases preceded *Davis v. Alaska*, *supra*, which changed cross-examination as to bias from a mere evidentiary rule to one of constitutional dimension. *Davis* together with *Alford* indicates to me that a trial jus-

tice may not rely on the lack of an offer of proof if it is apparent from the question that cross-examination in respect to bias is taking place.

The footnote in *State v. Crescenzo,* 114 R.I. 242, 252 n. 1, 332 A.2d 421, 427 n. 1 (1975), was merely dictum since the holding of the case did not require the determination of the appropriateness of an offer of proof on cross-examination. Indeed, such an offer was made, and the trial justice rejected it on the ground of relevance. *Id.* at 251–52, 332 A.2d at 427. It should also be noted that Justice Kelleher participated in *State v. DeBarros* and fully concurred with the opinion in that case. Obviously the holding of *DeBarros* would supersede the footnote in *Crescenzo.*

In any event I do not believe that any erosion of *DeBarros* is necessary in order to sustain the evidentiary ruling of the trial justice in the case at bar. It was obvious that he knew that the counsel for the defendant was cross-examining on the issue of bias. He gave counsel an adequate opportunity to explore this question and sustained an objection only after he concluded that further cross-examination on this issue was pointless. He gave defense counsel an opportunity to indicate further the direction in which he was proceeding if counsel so desired. If a trial justice believes that a subject has been exhausted, it is appropriate for him or her to seek guidance from counsel concerning the goal of his or her examination in case the trial justice has not fully perceived it. This query is different from one requesting an offer of proof, which I believe should not be required on cross-examination. It is obviously not forbidden in the event that counsel wishes to make one. In my opinion Rule 26 of the Superior Court Rules of Criminal Procedure was not intended to modify the rules of evidence as they then existed.