## STATE *vs.* ELLIOT R. HATHAWAY.

JULY 7, 1932.

PRESENT: Stearns, C. J., Rathbun, Sweeney, Murdock, and Hahn, JJ.

SWEENEY, J. This case is before the court on defendant's exceptions and two petitions, one praying for leave to file a motion for a new trial in the Superior Court on the ground of evidence newly discovered and the other praying for a new trial on the ground that he did not have a full, fair and impartial trial in the Superior Court. G. L. 1923, §§ 5107, 5108.

Defendant was indicted for the murder of Verna E. Russell March 23, 1931, by choking and strangling her. After trial in the Superior Court for Newport county, the jury returned a verdict of guilty of murder in the first degree.

May 1, 1931, defendant was arraigned and pleaded not guilty and the case was assigned for trial June 8.

June 8, defendant moved to postpone the trial. The motion was denied and the trial then commenced. Eighteen days were occupied by the trial and June 27 the jury returned their verdict. Defendant filed a motion for a new trial. This motion was heard and denied by the trial justice.

Defendant's bill of exceptions contains 371 exceptions, twenty-six of which are waived in his brief. His motion for a new trial contained thirty-three grounds. The trial justice wrote a rescript in which he considered all of the alleged grounds and denied the motion. We will now consider defendant's exception to the denial of this motion on the ground that the verdict was against the weight of the evidence.

March 23, 1931, Miss Verna E. Russell was a student nurse in a Fall River hospital. She was an attractive young woman about 20 years of age and a graduate of a high school. Defendant had lived in Fall River for many years. He was about 28 years of age and was also a graduate of a high school. On the evening of March 23, about 7:45 o'clock, the defendant called at the nurses' home and took Miss Russell for a motor ride. Just before calling for Miss Russell defendant had spent about twenty minutes at the home of his friend Vernon E. Galvin. When defendant left Mr. Galvin's home Galvin knew that defendant was going to the nurses' home. About 11:15 o'clock defendant returned to the Galvin home. Mr. Galvin, his wife and his mother were in bed. Defendant aroused Mr. Galvin and was admitted to the house. Defendant testified that he told Galvin that the girl had "passed out on him" and that he told Mr. Galvin's mother that he had been held up by two men; that one of them took the girl away from him; that she was out on the Stafford road and "maybe she is dead." Defendant asked permission to stay in the house that night. He talked about the occurrence and several times requested Galvin to go out with him to put up the automobile. At first Galvin refused to go, but in about an hour, after some persuasion, he consented to go. Instead of putting up the automobile defendant drove out where Miss Russell's body lay and pointed it out to Galvin, who left the automobile and looked at the body with a flash light. A few minutes afterward Galvin entered the automobile; and they arrived at Galvin's house at 1:20 o'clock a. m. Defendant entered the house, and shortly afterward drove away. About 2 o'clock a. m. Galvin walked with his wife to the home of defendant's father and talked with him. About 5 o'clock a. m. Galvin went to the police station in Fall River and reported the matter. The state police at Portsmouth were notified and about 6:30 a. m. state trooper Graemiger went to Fall River, met Galvin and went with

him to Winward Lane and there found the body of Miss Russell where Galvin had first seen it.

The medical examiner of Tiverton was notified of the death of Miss Russell, an autopsy was performed and the doctors who performed it were of the opinion that the death was caused by manual strangulation.

Defendant was the only person who knew the facts preceding the death of Miss Russell. He denied that he attempted to injure or assault her in any way. He testified that when they started on the ride Miss Russell said she could not go far as she must be back by ten o'clock; that he stopped and bought a bottle of gin and a bottle of ginger ale and paper cups; that he drove out on Stafford road at her request; that he turned into a place called Winward Lane and went about 200 feet and stopped; that they had some drinks; that he kissed her several times while she was sitting beside him on the front seat; that she turned forward the back of the seat and stepped over it and sat on the rear seat; that he tipped the seat forward and sat beside her; that he hugged and kissed her; that his hand was on her thigh; that she said she would have to be back at 10 o'clock; that he poured out the drinks; that he handed her the ginger ale bottle; that as he got down to get the gin bottle he heard the ginger ale bottle fall and a gagging and choking sound; that she fell forward and he lifted her onto the seat; that he asked her what was the matter and she made no sound; that he tried to help her; that he thought she needed air and lifted her out of the car and carried her several feet and put her down on the roadside; that he was there about five minutes; that he thought she was dead; that he backed his car out of the lane to Stafford road and left the car and walked back where she was and stood there about twenty minutes and then drove his car to Galvin's house; that he told Galvin the girl had "passed out on him" and requested Galvin to go with him and that Galvin refused; that upon his request he was given permission to stay at Galvin's home that night; that after some

persuasion Galvin agreed to go with him to put up the automobile; that when they were in the car he told Galvin they were going out on Stafford road; that while going there he told Galvin they were petting and had a few drinks when she had a gagging spell and "went out;" that he took Galvin to the place where the girl lay; that Galvin left the car and looked at the girl with a flash light and said she was dead; that they started to return and Galvin told him he could not stay in his house and that he had better get out of town; that he was in Galvin's house about ten minutes and then left in his car for Boston and Cambridge where he stopped at his uncle's house early in the morning for a few minutes; that he told his uncle he was in a scandal; that he abandoned his car in Boston; had his mustache shaved and took a bus for Worcester and New York where he registered at a hotel under an assumed name.

What defendant said to his friends, the Galvins, about the death of Miss Russell is very important. Vernon H. Galvin, called as a witness for the State, testified that about 11:15 o'clock p. m. he let defendant into the house and he sat in the parlor and put a bottle with some gin in it on the table; that defendant told Mrs. Galvin, Sr., that two men had come to the car and ordered them out and one of the men grabbed the girl by the throat and she screamed and the hold-up man hit her and she fell and that the other man had a gun and told defendant to leave; that this happened about 50 yards off the Stafford road and about twenty minutes before defendant arrived at Galvin's house; that defendant repeated several times that he was "in a jam" and that the girl was dead; that he made a gesture with his fist showing the manner in which the hold-up man was supposed to have struck the girl; that defendant was in the house about an hour and several times asked Galvin to go out and help put up the car and that finally he consented to go; that after they were in the car defendant said: "I am going out to Stafford road. That girl is out there;' that defendant said it would take about fifteen minutes; that

while driving out he said: "We were petting and she had a few drinks and she had a coughing spell and went out;" that defendant drove into Winward Lane about 50 yards and stopped the car and "pointed across me out the window and said: 'There she is;' that I looked and did not see anything; that defendant backed the car about one foot and pointed again, saying: 'Right there—look.' I looked and saw a form on the ground; I jumped out but defendant did not; I walked around the girl and put my flash light on her face and shouted to defendant: 'She is dead' and he said: 'I know it;' that I said: 'What are you going to do about it?' and he said: 'Nothing; I am getting away from here;' that I told him he was going to get out of the car and help me put the girl in and take her to Fall River and he said: 'No, I am not; I am going to beat it;' that he speeded up the motor and I ran a few feet for the car and got into it; that we backed out of the lane and started and I asked him again if he was going to leave the girl there and he said: 'Yes, somebody will find her in the morning;' that then I said: 'Look here, Hathaway, what do you know about this?' and he said: 'We had an argument;' and I said: 'Yes; what was it about?' and he said: 'She told me she was engaged to an interne and we had an argument and I struck her.' He asked me what I would do and I told him to go to his father and tell him about it or to the police. After we returned to my house he came in and stayed a few minutes and then left, and I told him he knew who to go to and that I was going to his father's house or to the police station."

Mr. Galvin's wife and his mother each testified that when defendant came into their home about 11:15 o'clock he said that he had been held up by two men, that one of the men grabbed the girl by the throat and struck her in the face, that she fell and her head struck a rock, and that he knew she was dead.

Testimony was introduced by the State tending to prove that marks on both sides of Miss Russell's throat were caused by a hand. Two of her upper front teeth—an arti-

ficial tooth joined to a natural one—were missing. These teeth were found in the lane about four feet from where her head lay. A small fragment of a tooth was found in Miss Russell's mouth. The defense claimed that this fragment lodged in her larynx and caused a spasm which contracted the larynx and resulted in her death. Defendant called two medical experts who testified in support of this claim. Opposed to their testimony was the testimony of the three doctors who examined the body, throat and head of Miss Russell. These doctors testified to the facts they observed and were of the opinion that Miss Russell died as a result of manual strangulation.

The medical examiner testified that in his opinion the signs of "petechial" hemorrhages about her eyes, throat and head were conclusive proof that death was due to forcibly shutting off the supply of air.

When denying the motion for a new trial on the ground that the verdict was against the weight of the evidence, the trial justice wrote a rescript in which he analyzed the testimony, factual and opinion, and said that it was ample to justify the verdict.

When a verdict has been approved by the justice who presided at the trial it will be sustained by this court in the absence of anything to indicate that the jury were improperly influenced or that the judge erred in his ruling denying the motion for a new trial. *State v. Badnelley,* 32 R. I. 378; *State v. Brown,* 5 R. I. 1; *State v. Sousa,* 110 Atl. 603; *State v. Adams,* 121 Atl. 418; *State v. Landri,* 141 Atl. 607.

Defendant denied that he attempted to injure or assault Miss Russell. He admitted that his statement to the Galvins about being held up by two men was untrue. The trial justice and the jury saw and heard him while he was testifying and had a better opportunity to appraise his testimony at its true value than we have. The testimony of the three Galvins seems credible. The jury may have believed that when the defendant told the Galvins that a

man had grabbed the girl by the throat and struck her in the face he was telling what he himself did instead of what an imaginary hold-up man had done.

Defendant's repeated statements to the Galvins that Miss Russell was dead, his return to the scene of the murder with his friend Galvin and pointing out her body to him, his refusal to help Galvin take the body to Fall River, his flight and disguise and false registration at a hotel were circumstances to be considered by the jury in weighing his testimony in connection with the other evidence in determining his guilt.

We have carefully examined the evidence and find no error in the decision of the trial justice that the verdict is amply sustained by the evidence.

Defendant urges several exceptions to the denial of his motion for a new trial on the grounds (1) that it was impossible for him to receive a fair trial in Newport county because public opinion had been inflamed against him by sensational articles in newspapers and that the jurors were prejudiced against him; (2) improper argument and comment by the Attorney General in his argument to the jury and (3) newly discovered evidence. The exceptions cannot be sustained.

Defendant examined each juror as to possible prejudice. In the examination of jurors much must be left to the discretion of the trial justice. *State* v. *Jacques,* 30 R. I. 578. Defendant was entitled to be tried by a fair and impartial jury. The statute gave him the right to challenge, without cause, a limited number of the jurors. § 4979, G. L. 1923. This statute gave the defendant the privilege of saying that he should not be tried by some particular jurors but it did not give him the right to select the jurors who were to try him. It appears in the record that defendant did not use all the peremptory challenges to which he was entitled. During the long trial the jurors were not allowed to separate and heard nothing about the case, except what they heard in the court room. Consequently there was no

opportunity for anyone to influence the jurors against defendant during the trial.

Defendant made no objection to any part of the argument of the Attorney General. By failing to request the trial justice to instruct the jury to disregard the alleged objectionable remarks, defendant waived the right to subsequently object thereto. *State* v. *Hull,* 18 R. I. 207; *State* v. *Farr,* 29 R. I. 72; *State v. Riddell,* 38 R. I. 506.

The alleged newly discovered evidence is contained in the affidavit of a doctor who had testified as a witness called by defendant. The trial justice ruled that the matters contained in the affidavit must have been known to the doctor during the trial; that he could have been examined about them and that the affidavit disclosed no newly discovered evidence. We find no error in this ruling.

The trial justice instructed the jury in the law applicable to the indictment and the evidence in the case. Defendant submitted twenty requests to charge. The trial justice included in his general charge such portions of these requests as he thought proper and denied the others. Defendant excepted to the portion of the charge which stated that the jury could return only one of three possible verdicts; first degree murder, second degree murder or not guilty. This exception is not in the bill of exceptions but it will be considered in connection with defendant's exception to the denial of his tenth request to charge which was: "The fact that the indictment charges murder, as set forth therein, does not prevent the jury from bringing in a verdict of manslaughter." So much of our statute defining murder and the degrees thereof necessary to be stated for the consideration of this exception is as follows: "The unlawful killing of a human being with malice aforethought is murder. Every murder perpetrated by . . . wilful, deliberate, malicious and premeditated killing, or committed in the . . . attempt to perpetrate any . . . rape . . . is murder in the first degree. Any other murder is murder in the second degree. . . ." § 6013, G. L. 1923. This statute

502

does not change the crime of murder from what it was at common law. It merely provides for different degrees of the crime depending upon the circumstances under which it was committed. *State* v. *Saccoccio,* 50 R. I. 356; *State* v. *Fenik,* 45 R. I. 309.

The testimony introduced by the State proved a death by violence. Three medical experts who had viewed the body testified that the deceased had died from manual strangulation; that the marks on her neck resembled pressure marks made by the fingers of a hand. Manslaughter is the unlawful killing of a human being without malice aforethought. *State* v. *Fenik, supra.* Defendant testified that he did not injure Miss Russell in any way. If this be true, he was entitled to a verdict of not guilty. There was no evidence on which the jury could find him guilty of manslaughter. The only conclusion that could be drawn from the evidence was murder or death by accident.

The trial justice is required to instruct the jury only in the law relating to the case. § 4640, G. L. 1923. The defendant is not entitled to a charge of a lower degree of homicide where the evidence would not sustain a finding of a lesser degree. *State* v. *Saccoccio, supra,* 30 C. J. 414. The trial justice instructed the jury in the elements necessary to be proved in order to constitute murder in the first degree and also murder in the second degree. No exception was taken to this portion of the charge by defendant and it became the law of the case. The exception to the refusal to charge that the jury might find defendant guilty of manslaughter is overruled.

The remaining exceptions are not of sufficient importance to require discussion. We have read and considered them. Many of the exceptions are frivolous; some of them are arguable; none of them is based on prejudicial error and all are overruled.

In support of the petition for leave to file a motion for new trial in the Superior Court on the ground of evidence newly discovered two affidavits have been filed. One is by

a medical expert and states in substance that, in his opinion, the death of Miss Russell was not caused by manual strangulation. The other is by a medical expert who testified as a witness called by defendant.

The first medical expert was abroad during the trial. No motion was made to continue the case on account of his absence. His testimony would be merely cumulative to the testimony given by the other experts called by defendant. As to the second expert, the matters contained in his affidavit are not newly discovered evidence. He could have been examined about them when called as a witness. Furthermore, in view of the evidence produced by the State, we do not think the opinion of these affiants would change the result if another trial were had. The petition is denied.

Defendant has petitioned for a new trial on the ground that he did not have a full, fair and impartial trial in the Superior Court. He alleges that for several reasons the jurors were prejudiced against him and that the Attorney General made unfair and improper comments in his argument to the jury. These reasons were the basis of exceptions which have been overruled.

Defendant's attorneys complain that many times the trial justice declined to hear them argue objections to the admission or exclusion of testimony. There is no merit in this complaint. A trial judge is familiar with procedure and the rules of evidence. He is not obliged to listen to argument on the admission or rejection of evidence. If he needs any assistance from counsel he can ask for it. The aggrieved party may preserve his rights by taking an exception to an adverse ruling, excluding or admitting testimony. There is no exception to the refusal of the trial justice to hear arguments on the admission or rejection of evidence.

The remaining ground is that the trial justice "by tone of voice, manner and countenance, as well as by words" so influenced the jury that the defendant did not have a full, fair and impartial trial. We have carefully examined the

record and find no words in it which would influence the jury against the defendant. The charge of the trial justice was clear, fair and impartial. There is not the slightest suggestion in it of his opinion of the guilt or innocence of the defendant. He instructed the jurors that the presumption of innocence remained with the accused until it was shown by the State that he was guilty of the offense charged beyond a reasonable doubt. He also charged that there was no burden on the defendant to show anything or to explain anything. His final instructions were to do equal and exact justice between the State of Rhode Island and the defendant and to have their verdict in accord with the facts.

An examination of the record satisfies us that defendant had a full, fair and impartial trial and that justice does not require that there should be a new trial of the case.

Petitions numbered 7124 and 7128 are denied and dismissed.

All defendant's exceptions in No. 7090 are overruled and the case is remitted to the Superior Court for further proceedings.

*Benjamin M. McLyman, Attorney General, Edward W. Day, Asst. Attorney General, Sigmund W. Fischer, 2nd Asst. Attorney General,* for State.

*George Hurley, John H. Nolan, Walter V. Moriarty, Walter V. Connly,* for defendant.