383 A.2d 1012.

STATE *vs.* BRUCE L. JOHNSON.

MARCH 3, 1978.

PRESENT: BEVILACQUA, C.J., PAOLINO, JOSLIN, KELLEHER AND DORIS, JJ.

750

JOSLIN, J.   The defendant, Bruce L. Johnson, was tried and convicted before a jury in the Superior Court on indictments charging him with murder, kidnapping and assault and battery with intent to commit rape. The victim was a 14-year-old girl. On appeal, the errors assigned relate to the denial of certain pretrial motions and to allegedly erroneous rulings at the trial.

On October 16, 1973 at about 7:30 in the evening four boys, while walking along Shore Road in Westerly, noticed a large automobile drive slowly by them, turn around and then turn into the driveway of a vacant residence. The boys continued walking along Shore Road heading toward the home of one of them and, when about 100 feet beyond the driveway, they turned back and saw a tall, slender man with his hair combed back, wearing a black and white plaid jacket. They believed him to be about 35 years old. As they

neared their destination, which was about one-tenth of a mile from the driveway, they heard cries or screams coming from the vicinity of the vacant residence. They then saw the motor vehicle, now containing a passenger, leave the driveway and proceed along Shore Road at 40 or 50 miles an hour. What they had seen prompted their return to the driveway where they found girl's gym clothes and school books. The books contained the name of the victim. They reported the incident to the police and, when a police officer arrived on the scene to investigate their report, the boys gave the gym clothes and books to him.

When police inquiries at the victim's home disclosed that she was missing, a search was instituted. On the following day, October 17, her body, together with various articles of clothing and a pink cloth, were found in a Westerly gravel pit.

The police then began an intensive 5-days' investigation. On the 18th and 19th, one of the boys who had been walking along Shore Road accompanied Westerly police in a search for the suspicious automobile. He identified a vehicle in the driveway of defendant's home as similar to the one previously seen on Shore Road. The next day, a state police officer, who was also searching for the vehicle described by the boys, sighted the same automobile in the same driveway. He stopped to investigate and in the course of a 15-minute questioning of defendant's family learned that defendant, who was not expected home for a few hours, was the owner of the vehicle. Rather than await his return, the officer left the house after telling the family that he wished to talk with defendant about any activity he might have observed on the evening of the murder. As the officer returned to his police cruiser, he noticed that one of the rear tires of the automobile in the driveway resembled a tire imprint found near the victim's body.

That evening, October 20, the officer telephoned defendant and requested him to come to the police station for ques-

tioning regarding his activities on the day of the homicide. The defendant complied with the request and, in the presence of his father who had accompanied him to the station house, was questioned briefly and then released.

Because both defendant, except for his age, and his automobile matched the general description given by the boys, and also because he had appeared to be nervous during the questioning, suspicion began to focus on him. This suspicion grew the next day when defendant's mother and sister identified the pink cloth found near the victim's body as coming from an old nightgown that defendant had used to wax his automobile, and on the 22nd the officers in charge of the investigation ordered him brought to the station. That evening, the Johnson family automobile was stopped by the Westerly police, and defendant's father, the driver, was directed to follow the police cruiser to the station. Upon arrival, defendant was immediately ushered into the chief's office, placed under arrest and, prior to being questioned, advised of his rights as mandated by *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). No threats or promises were made to defendant, and he signed a form waiving his *Miranda* rights and agreed to answer questions. The police fixed the time of arrest at about 8 p.m. while defendant fixed the time of arrest at about 7 p.m. The defendant confessed at about 8:20 p.m. He was then asked to reduce his statement to writing. He agreed and finished writing the statement at 10:30 p.m. The confession was also tape recorded and this was completed at 2:30 a.m. In addition, police officers went to defendant's home that night, and, after serving a search warrant on his father, searched the residence and seized various items. The next day, pursuant to a second search warrant, police seized defendant's automobile and searched it at the police station.

At the trial defendant pleaded not guilty and not guilty by reason of insanity. The jury's verdict was that defendant was both guilty and sane.

## THE MOTION TO SUPPRESS THE CONFESSIONS

### A. *Miranda Violations.*

Prior to the trial defendant moved to suppress his confessions. Among the grounds urged was that the failure of the interrogating officer to give him the *Miranda* warnings prior to the October 20th questioning so tainted the October 22nd station house interrogation as to make inadmissible the confessions obtained that night. The trial justice, however, found as a fact that defendant was not in custody when the October 20th questioning took place and accordingly rejected this ground as a reason for suppression.

*Miranda* sets out the procedures that police officers must follow at a "custodial interrogation." It does not, however, dictate exclusion of a confession merely because questioning of the accused took place in a station house or because the interview was of a person suspected of a crime. Although questioning in that kind of atmosphere has its coercive aspects, the person questioned is nonetheless not entitled to *Miranda* warnings unless, in addition, he has been "taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda* v. *Arizona*, 384 U.S. at 444, 86 S. Ct. at 1612, 16 L. Ed. 2d at 706. It is only "*that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited." *Oregon* v. *Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 714, 50 L. Ed 2d 714, 719 (1977).

In the case before us, defendant on October 20, at the request of the police and accompanied by his father, went to the police station for questioning. He testified that he did not feel that he was then under arrest; and at the conclusion of that evening's brief interrogation, he left the station house without having any restriction placed upon his freedom to depart or to go where he wished.

Although police suspicions began to center on him following that interrogation, not until the following day when his

mother and sister identified the pink cloth found near the victim's body did the police finally order defendant apprehended.

Clearly these facts establish that on the 20th defendant's freedom had not been so restricted as to render him in custody, and, therefore, the omission of the *Miranda* warnings at the interrogation that evening in no way tainted or made inadmissible his later confessions.

B. *Claim of Wrongful Detention under Super. R. Crim. P. 5(a).*

The defendant also complains that arresting him at 8 p.m. on October 22 and not bringing him before a District Court judge until 2 p.m. on October 23 violated the provision of Super. R. Crim. P. 5(a) which requires that a person arrested without a warrant be taken before a District Court judge "without unnecessary delay." The defendant contends that the delay in this case rendered his detention unlawful and the confessions obtained during that period inadmissible under principles enunciated in *Mallory* v. *United States,* 354 U.S. 449, 77 S. Ct. 1356, 1 L. Ed. 2d 1479 (1957). That argument is clearly without merit.

The period between defendant's arrest and his appearance before a District Court judge may have been unduly protracted. Nonetheless, the critical period for determining whether the questioning was so unreasonable as to affect the admissibility of his confessions was the span of less than 7 hours between arrest and the last of those confessions, and not the more extended period between his arrest and appearance. In short, delay, if it is to render a confession inadmissible, must have been operative in inducing the confession, and obviously only the detention that precedes a confession can have that effect. *See United States* v. *Mitchell,* 322 U.S. 65, 70, 64 S. Ct. 896, 898, 88 L. Ed. 1140, 1143 (1944); *United States* v. *Seohnlein,* 423 F.2d 1051, 1053 (4th Cir. 1970); *Bailey* v. *United States,* 328

F.2d 542, 544-46 (D.C. Cir. 1964); *State* v. *Traub*, 51 Conn. 246, 249-50, 196 A.2d 755, 757 (1963).

In this case, defendant confessed within one-half hour of his arrest and that confession was reduced to a writing signed by him, as well as recorded by him on a tape, by 2:30 a.m. on October 23 — clearly a period of time between arrest and confession not constituting an unnecessary delay. *People* v. *Skowronski*, 61 Mich. App. 71, 82, 232 N.W.2d 306, 311 (1975); *Commonwealth* v. *Wilson*, 463 Pa. 1, 10, 329 A.2d 881, 885-86 (1974); *Hemauer* v. *State*, 64 Wis. 2d 62, 74, 218 N.W.2d 342, 347-48 (1974). The defendant, after confessing, was held prior to arraignment for an additional period of time which, when added to preconfession time, may have been sufficient to constitute in the aggregate unnecessary delay was without causative effect upon his prior decision to confess. "Even if his detention during this subsequent period was unlawful, it did not retroactively make inadmissible [confessions] voluntarily given at its inception." *Bailey* v. *United States*, 328 F.2d at 544.

C. *Illegal Arrest.*

Finally, defendant, conceding arguendo that there were reasonable grounds to believe that he had committed a felony, nonetheless argues that his warrantless arrest was illegal because there was more than sufficient time to obtain a warrant and that his confessions, being products of an illegal arrest, were therefore inadmissible. This simply is not law. Under the rule that prevailed at common law, a police officer was permitted to make a warrantless felony arrest on probable cause whether or not the felony was committed in his presence. *United States* v. *Watson*, 423 U.S. 411, 418, 96 S. Ct. 820, 825, 46 L. Ed. 2d 598, 606 (1976). Our statute governing felony arrests merely reflects the common law rule. Rather than suggesting that a warrant is necessary to validate a felony arrest, it specifically provides that a peace officer may arrest without a warrant if he "has reasonable

ground to believe that a felony has been or is being committed and that the person to be arrested has committed or is committing it," or "[t]he person to be arrested in fact has committed or is committing a felony, and in such case it shall be immaterial that the officer did not believe him guilty or on unreasonable ground entertained belief in his guilt." General Laws 1956 (1969 Reenactment) §12-7-4. Moreover, "a police officer may arrest without warrant one believed by the officer upon reasonable cause to have been guilty of a felony * .* * ," *Carroll* v. *United States*, 267 U.S. 132, 156-57, 45 S. Ct. 280, 69 L. Ed. 543, 553 (1925), and the Supreme Court "has never invalidated an arrest [for a felony] supported by probable cause solely because the officers failed to secure a warrant." *Gerstein* v. *Pugh*, 420 U.S. 103, 113, 95 S. Ct. 854, 862, 43 L. Ed. 2d 54, 65 (1975).

None of defendant's arguments support his claim that the trial justice erred in refusing to suppress his confessions.

## VOIR DIRE

In this case the trial justice conducted the voir dire examination-in-chief of prospective jurors. The defendant contends that following that examination his counsel should have been permitted to propound to those jurors certain inquiries submitted in writing to the trial court in advance of the voir dire and that he also should have been allowed to pose to the jurors such additional queries as would have been provoked had the jurors been permitted to respond to the written questions. The thrust of this contention is that the issue of defendant's mental condition at the time of the commission of the offense charged was vital to his case and that therefore the court erred in not affording his counsel extensive leeway to inquire of the jurors about their views on insanity as a defense to a criminal charge.

No one disputes that under Super. R. Crim. P. 24(a) the trial court may itself conduct the voir dire examination-in-chief of prospective jurors, and that such an examination

may be supplemented by further inquiries from a party of his counsel.[1] Rule 24(a) conforms to G.L. 1956 (1969 Reenactment) §9-10-14, as amended by P.L. 1970, ch. 235, §1, which stipulates that counsel for either party shall not be precluded from examining prospective jurors. *See also State* v. *Spivey*, 114 R.I. 43, 44, 328 A.2d 414, 415 (1974). But this is not to say that this right to inquire exists without limitations. Indeed, quite the opposite is true, for the permissible areas of inquiry are expressly restricted by Rule 24(a) to "determining whether a prospective juror is related to a party, or has any interest in the case or has expressed or formed an opinion or is sensible of any bias or prejudice therein." Moreover, inasmuch as the rule limits the further inquiry to supplementing the trial justice's examination, that inquiry should not be repetitive. *See People* v. *Green*, 30 Ill. App. 3d 1000, 1011, 333 N.E.2d 478, 487 (1975). Neither should it be "argumentative, cumulative or tangential." *Brundage* v. *United States*, 365 F.2d 616, 618 (10th Cir. 1966). Finally, whether a question meets these and other pertinent criteria is addressed to the trial justice's discretion. *State* v. *Greene*, 74 R.I. 437, 442, 60 A.2d 711, 714 (1948); *State* v. *Hathaway*, 52 R.I. 492, 500, 161 A. 366, 369 (1932). In short, whether the denial of an accused's request to be allowed to supplement the court's examination-in-chief of prospective jurors is erroneous will essentially turn on whether objection by the state to his

---

[1]Super. R. Crim. P. 24(a) provides:

"The court may permit a defendant or his attorney and the attorney for the State to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event, the court shall permit the defendant or his attorney and the attorney for the State to supplement the examination by further inquiry or, upon request, shall itself put to the prospective jurors such additional questions as are submitted by the parties or their attorneys. The examination of prospective jurors shall be for the purpose of determining whether a prospective juror is related to a party, or has any interest in the case, or has expressed or formed an opinion or is sensible of any bias or prejudice therein. The examination shall be conducted under oath if requested."

questions would be sustained. If it would, then to deny him the right to put those questions is not prejudicial error.

The record in this case shows that prior to the calling of any of the prospective jurors, defendant submitted 62 written questions to the trial justice. Twelve of those questions relate to defendant's special plea of "not guilty by reason of lack of criminal responsibility due to mental illness." The defendant complains principally of the rejection of those questions. They included such questions as whether the jurors would acquit a defendant if he were temporarily insane or overwhelmed by an irresistible impulse at the time of the commission of the act charged; whether they would be prejudiced against the defense that a temporarily insane defendant lacked a specific intent to murder; whether they would follow the trial justice's instructions with reference to the defense of mental illness; whether they believed in partial or emotional insanity; and whether they had any prejudice against psychiatric testimony in support of the defense of insanity.

In conducting the voir dire the trial justice was responsible for probing the minds of the prospective jurors in order to ascertain whether they could serve fairly and impartially. *See Wagner* v. *United States*, 264 F.2d 524, 527 (9th Cir. 1959); *Commonwealth* v. *Galvin*, 323 Mass. 205, 213, 80 N.E.2d 825, 831 (1948); *State* v. *Manley*, 54 N.J. 259, 280, 255 A.2d 193, 205 (1969); Kerr, *Empaneling of a Jury*, 28 F.R.D. 185, 188-89 (1962). In this case the trial justice adequately discharged that responsibility. Although she refused to incorporate into her examination-in-chief defendant's written questions in the form presented, she did inquire of the prospective jurors whether they had mental reservations, fixed opinions, or prejudices about mental incapacity as a defense to a criminal charge, whether they would find it difficult to sit in such a case, and whether they would follow her instructions relative to what was meant by insanity and the effect to be accorded to expert testimony on that issue. Following those inquiries, two of the prospective

jurors expressed doubts about the principle that permits insanity as a defense to a crime and, after further questioning, the trial justice excused those two jurors.

At the conclusion of that examination, defendant in nowise indicated in what specifics he believed it inadequate or faulty. Instead, he persisted only in his general request that he be allowed to propound the previously submitted 12 questions and that he also be permitted to follow up those questions with an in-depth inquiry into the jurors' views on insanity as a defense. He did not then, however, nor does he now, make anything but a general assertion that the court erred in refusing to allow him to pursue this course and he makes no attempt at establishing the individual or collective propriety of the submitted questions except to state that they were prepared after consulting unidentified "reputable Form Books."

We have reviewed the contents of the trial justice's examination and are satisfied that it provided a comprehensive explanation of the offenses charged and the special defense pleaded, as well as of the duties of the court and jurors. There is nothing in the record which shows that defendant or his counsel was in any way prevented from discovering any fact or reason why a juror might be biased, prejudiced or otherwise lacking proper qualifications. Moreover, the questions submitted by defendant were improper because they were repetitive, cumulative, argumentative, tangential or irrelevant. We conclude, therefore, that defendant has failed to show that he was prejudiced by the trial justice's refusal to allow his counsel to examine the prospective jurors.

## THE COURT-ORDERED PSYCHIATRIC EXAMINATION

Next, we consider defendant's several assignments of error arising out of his special plea that he was not criminally liable for the offenses charged by reason of mental illness. Prior to trial the state moved pursuant to G.L. 1956 (1968

Reenactment) §26-4-3(b), as enacted by P.L. 1973, ch. 175, §2,[2] for the appointment of a psychiatrist to ascertain defendant's competency to stand trial. The motion was granted and Dr. Herbert Myers, a psychiatrist employed by the state, was appointed. Although the examination was conducted, no competency hearing was held, defendant having conceded that Dr. Myers was correct in concluding that he was competent to stand trial. The state also moved prior to trial, under authority of Super. R. Crim. P. 28(a),[3] for the appointment of an impartial expert to determine whether defendant could avoid criminal responsibility for the alleged offenses by reason of mental illness. This motion also was granted and Dr. Myers was appointed.

Error is claimed, first to the appointment of Dr. Myers, second, to the order compelling defendant to submit to psychiatric examinations, and third, to the ruling permitting Dr. Myers to testify as to statements made by defendant during his examinations.

---

[2]General Laws 1956 (1968 Reenactment) §26-4-3(b), as enacted by P.L. 1973, ch. 175, §2, reads as follows:

"At any time prior to imposition of sentence, if a court in which a criminal proceeding is pending has reason to suspect that a defendant is incompetent, it shall order an examination of the defendant by one or more qualified physicians. Whenever practicable, the examination shall be conducted at the courthouse or at the place where the defendant is being detained. The scope of the examination shall be limited to the question of whether the defendant is competent and the court shall instruct the examining physician on the standards for determining this question.

[3]Super. R. Crim. P. 28(a) reads in pertinent part:

"The court may on its own motion or upon the motion of party order the defendant or the State or both to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations. The court may appoint any expert witnesses agreed upon by the parties, and may appoint witnesses of its own selection. * * * A witness so appointed shall advise the parties of his findings, if any, and may thereafter be called to testify by the court or by any party. He shall be subject to cross-examination by each party. * * * The parties also may call expert witnesses of their own selection."

## A. *Challenge to the Appointment.*

The defendant challenges Dr. Myers' appointment because of an alleged lack of both competency and impartiality. Whether Dr. Myers was competent to testify as an expert on the particular subject to which his appointment was directed was a question within the trial justice's sound discretion. *State* v. *Camerlin,* 117 R.I. 61, 65, 362 A.2d 759, 761 (1976); *State* v. *Capone,* 115 R.I. 426, 435, 347 A.2d 615, 620-21 (1975). Its exercise will not be disturbed on review unless shown to have been palpably and grossly wrong. *State* v. *Smith,* 70 R.I. 500, 511, 41 A.2d 153, 158 (1945). That showing was not made in this case.

The charge of lack of impartiality stands on no firmer ground. It is, of course, true that at the guilt trial Dr. Myers appeared as a witness for the state. When he assumed that role, the trial justice ruled that he thereby lost his standing as an impartial expert and that he acquired the same status as if he had from the outset of the case been a witness for the state. But defendant's challenge is not to his later role, but to the fact that when originally appointed he was a state employee.[4] That he was so employed was not a sufficient ground for faulting his appointment on partiality grounds, particularly since defendant failed to exercise his right under Super. R. Crim. P. 28(a) to question the appointment when originally made by submitting a counter-nomination. In the circumstances we do not believe that the appointment, when made, suffered because of lack of impartiality.

## B. *Compelled Submission to Psychiatric Examination.*

More serious than the contentions just considered is defendant's further contention that his right not to in-

---

[4]He was employed as a forensic psychiatric consultant at the Adult Correctional Institutions and the Institute of Mental Health and made examinations when requested by the courts, the Attorney General, the public defender, the prison physician and the parole board.

criminate himself was violated by requiring him to submit to a pre-trial psychiatric examination to ascertain the condition of his mind.

Generally such a compelled examination has withstood constitutional attack at least if the accused was protected from later use at his guilt trial of any inculpatory statements he may have made during the examination. McCormick, *Evidence* §134 at 285 (2d ed. 1972).[5] The rationale for that result in the case of an examination to determine competency to stand trial is that the compelled submission

> "is arguably without the protection of the privilege, since the proceeding pursuant to which the examination is conducted cannot terminate in criminal conviction but merely in a factual determination whether it is appropriate to proceed with the inquiry into guilt or innocence. If this kind of investigation can be separated from the trial itself, the competency investigation can be accurately characterized as not involving a danger of incrimination and thus not giving rise to privilege status." *Id.* at 286.

The justification for a compelled examination to obtain information about whether an accused possessed the requisite mentality at the time of the alleged offenses to be found guilty as charged is that "[t]he maintenance of a 'fair state-individual balance' clearly require[s] that the government be permitted to have [a] defendant examined" for this purpose. *United States* v. *Albright,* 388 F.2d 719, 724 (4th Cir. 1968). To hold otherwise would result in the anomalous situation of allowing an accused to present expert

---

[5]In this state G.L. 1956 (1969 Reenactment) §26-4-3(j), as enacted by P.L. 1973, ch. 175, §2, provides that:

> "No statement made by a defendant in the course of an examination conducted [to determine competency to stand trial] * * * shall be admissible in evidence against the defendant in any criminal action on any issue other than his mental condition."

testimony to support his defense of innocence by reason of insanity and at the same time to permit him to invoke a constitutional privilege to preclude the prosecution from presenting evidence to the contrary. *United States* v. *Handy*, 454 F.2d 885, 888-89 (9th Cir. 1971); *Pope* v. *United States*, 372 F.2d 710, 720 (8th Cir. 1967). "He ought not to be able to advance the claim." *State* v. *Whitlow*, 45 N.J. 3, 17, 210 A.2d 763, 770 (1965).

C.  *Use of Inculpatory Statements.*

A more difficult question involves the trial testimony of a psychiatric examiner that includes inculpatory statements made by an accused during a compelled submission to a psychiatric examination. It is generally agreed that use of that kind of statement is improper if it is intended to prove that the accused performed the act charged. McCormick, *Evidence* §134 at 286 (2d ed. 1972). It is otherwise, however, when the statement is adduced solely for the purpose of disclosing the information upon which the psychiatrist based his opinion of the accused's mental status at the time of the alleged act. In that situation the same interest in the maintenance of a "fair state-individual balance" that permits the examination also permits the admission of the statement, provided that admission is buttressed by a preventative instruction to the effect that evidence of the inculpating statement shall not be regarded as proof of the truth of the facts disclosed and may be considered only on the insanity issue. *In re Spencer*, 63 Cal. 2d 400, 412, 46 Cal. Rptr. 753, 761, 406 P.2d 33, 41 (1965).

New Jersey adds to this requirement (1) that the instruction be explicit and unqualified; (2) that it be given when the testimony is offered and again when the jury is charged; and (3) that the testimony be allowed only

> "[i]f, in the opinion of the examiner, it is necessary for the formulation of an opinion as to sanity to discuss the circumstances of the alleged crime * * * ." *State* v. *Whitlow*, 45 N.J. at 21, 210 A.2d at 772.

Wisconsin, taking a slightly different tack, holds that an accused who has inculpated himself during a compelled submission "is entitled to ask for a sequential order of proof on the issues of guilt and insanity in order to assure himself of his constitutional rights of a fair trial, and such compulsory statements and confessions can only be used on the issue of insanity and not in any way upon the issue of guilt." *State ex rel. La Follette* v. *Raskin,* 34 Wis. 2d 607, 627, 150 N.W.2d 318, 328 (1967).

We have referred to the several views which prevail in this area more to inform bench and bar on the subject than to adopt a rule for this state. Were there a necessity for the selection of a rule, we would be inclined to the New Jersey view. In this case, however, we are not forced to choose, for here defendant, although complaining that Dr. Myers' testimony at the guilt trial runs afoul of his self-incrimination privilege, does not follow up that complaint by pointing to a single inculpatory statement appearing in Dr. Myers' testimony.

Moreover, our own reading of the transcript reveals only one statement that is arguably probative of defendant's guilt.[6] Even that statement is not really inculpatory but rather merely assumes the commission of the offenses charged. The overwhelming and untainted accumulation of evidence of defendant's guilt, including three confessions and extensive testimony by his own expert witness that also assumes his guilt, satisfies us beyond a reasonable doubt that this isolated observation of the state's expert in no way contributed to the jury's verdict. Thus, even if the preventive

---

[6]That statement reads as follows:

"I base the opinion on what Bruce Johnson told me, on the way he felt, on his previous earlier life, on his own feelings about himself, on the way he described to me the emotions he experienced at the time of the commission of the offense; I think this is it."

instructions[7] that accompanied the admission of this statement fell short of full compliance with the New Jersey rule, the error does not warrant reversal under the harmless error rule enunciated in *Chapman* v. *California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967) and followed by this court in *State* v. *Sherman*, 113 R.I. 77, 83, 317 A.2d 445, 449 (1974).

## INSANITY AS A DEFENSE

The defendant's final and perhaps most significant contention is that the trial justice erred in refusing to instruct the jury on a test for determining sanity other than the *M'Naghten* rule. That rule, which has been followed in this state since *State* v. *Quigley*, 26 R.I. 263, 58 A. 905 (1904) and was expressly adopted in *State* v. *Andrews*, 86 R.I. 341, 352, 134 A.2d 425, 431-32 (1957), states that in a criminal case a defendant will not be held criminally responsible if, when he committed the offense charged, he was laboring under such a defect of reason, from disease of the mind, as not to know either the nature and quality of the act he was doing or that what he was doing was wrong.

When we decided *Andrews*, *M'Naghten* was the majority rule. In recent years, however, it has been the subject of in-

---

[7] Prior to Dr. Myers' testifying, the trial justice cautioned the jury as follows:

"You are to consider statements testified to by this witness [Dr. Myers] * * * made by the defendant as bearing only on the issue of this special defense of insanity which I will explain to you later. What I am saying is that when a witness, such as a psychiatrist, testifies as to what was told to him by a defendant during the course of the examination, you are not to use those statements on the issue of guilt or innocence. You are to use those statements and the testimony in the context of special instructions that I will give you as to the issue of the special defense which I will also explain to you. So bear that in mind as you listen to this testimony."

The trial justice's charge to the jury included the following:

"As I said to you yesterday, don't use those portions of testimony that came in through the psychiatrists on the issue of guilt or innocence. Those portions of the testimony as to what the defendant said to the psychiatrists, that should be used by you only on the issues that you have to direct your attention to under the special defense of insanity."

creasing criticism and many states have abandoned it. Some have replaced it with the *Durham* rule — that a defendant is not responsible for his criminal act if that act was the product of a mental disease or defect. *See Durham* v. *United States,* 214 F.2d 862 (D.C. Cir. 1954); *State* v. *Jones,* 50 N.H. 369, 9 Am. Rep. 242 (1871); others have turned to the test found in the American Law Institute's Model Penal Code. It absolves a defendant from responsibility for his criminal conduct if, at the time of that conduct, as a result of a mental disease or defect, he lacked substantial capacity either to appreciate its criminality or to conform his actions to the requirements of law. A.L.I. *Model Penal Code* §4.01. *See Hill* v. *State,* 252 Ind. 601, 251 N.E.2d 429 (1969); *State* v. *White,* 93 Idaho 153, 456 P.2d 797 (1969). The defendant calls upon us to join the states that have forsaken *M'Naghten.*

When faced with similar calls in the past, we acknowledged a willingness to reexamine the *M'Naghten* rule. At the same time we emphasized that we would consider the substitution of another test only upon being supplied with competent evidence from qualified experts of the proposed substitute's greater efficiency and reliability. *State* v. *Jefferds,* 91 R.I. 214, 162 A.2d 536 (1960); *accord, State* v. *Nault,* 112 R.I. 687, 314 A.2d 627 (1974); *State* v. *Page,* 104 R.I. 323, 244 A.2d 258 (1968). We also delineated in some detail the procedure that one seeking a change in the rule should follow. *State* v. *Jefferds,* 91 R.I. at 217-18, 162 A.2d at 538. Essentially, the procedure calls for bringing the question to this court by basing an appeal on an objection to a ruling excluding the proffered testimony or, if the testimony is received, to a ruling denying a request that the jury be instructed to apply the test for criminal responsibility that is postulated by the accused's experts.

The defendant followed the latter route in this case. His expert witness was Dr. Leonard Friedman, a lawyer and psychiatrist. Doctor Friedman explicated the three generally recognized tests for determining sanity — the

*M'Naghten, Durham,* and Model Penal Code rules. In further testimony he discussed at length what he believes were the shortcomings of the former two rules and the virtues of the latter rule. The defendant argues that this testimony satisfied his obligation to produce evidence of the validity and availability of a sanity test other than *M'Naghten.* Having requested and been denied a jury instruction based upon that testimony, defendant now contends that the question whether to abandon *M'Naghten* is squarely before this court in the posture prescribed in *Jefferds.*

We question neither Dr. Friedman's qualifications nor defendant's compliance with the *Jefferds* requirements and procedures. Nonetheless, we are not prepared at this point to abandon *M'Naghten* and to substitute another test, principally because the record before us does not contain enough information to convince us that *M'Naghten* is an inferior rule. Another reason is that this case has clearly demonstrated the inefficacy of the *Jefferds* procedures. Placing the burden of production on an accused allows him to select what alternative we should consider as a substitute for *M'Naghten.* Thus, for example, in this case defendant's expert witness espoused the Model Penal Code rule; the absence of any expert testimony favoring the *Durham* rule limits us, in practical terms, to choosing between the Model Penal Code and *M'Naghten.*

The defendant could, of course, have introduced expert testimony in support of all the medically and legally accepted alternatives to *M'Naghten.* However, other pressures, particularly the cost of retaining expert witnesses, undoubtedly resulted in the expert testimony in this case presenting a far less comprehensive overall view of the subject than would have been available were the prescribed procedure broad enough to permit our decision to be based, not only on the expert testimony adduced at trial, but also on the substantial body of literature that now exists on the subject.

The futility of defendant's good-faith attempt to comply with *Jefferds* convinces us that we should no longer adhere to a procedure which, although having much to commend it 18 years ago when adopted, has since clearly become inadequate. Accordingly, we hereby overrule *Jefferds* and its progeny on the ground that the procedures delineated therein do not offer an effective means of bringing before this court the data requisite to making an informed determination on whether a different rule should prevail in this state for determining the sanity of a criminal defendant.

We recognize that defendant may conclude that we are "pulling the rug out from under him." That certainly is not our intention. Rather, we desire to assure him the benefit of a full and fair hearing on the insanity issue. In furtherance of that purpose, we are ordering rebriefing and reargument in the case solely on the issue of the selection of a sanity test. Accordingly, defendant and the state shall file supplemental briefs within 60 days and the clerk, following submission of briefs, shall place the case on the argument calendar. In addition, we will invite participation, as amici curiae, by various legal and medical groups, as well as by other interested parties. We will then be in a far better position than we now are to determine whether to retain *M'Naghten* as our test or to substitute another for it.

If, after reargument, we adopt a sanity test other than *M'Naghten*, the defendant will be entitled to a new trial solely on the sanity issue, all of his other contentions having been rejected. If we retain *M'Naghten*, the defendant's convictions will be sustained.

Pending a final determination of this case, the *M'Naghten* rule will continue to be applied in all cases as the test for determining the criminal responsibility of an accused who claims he is blameless by reason of mental illness.

It is so ORDERED.

Mr. Justice Paolino participated in the decision, but retired prior to its announcement.

*Julius C. Michaelson,* Attorney General, *Nancy Marks Rahmes,* Special Assistant Attorney General, for plaintiff.

*Cappuccio & Cappuccio, Frank S. Cappuccio,* for defendant.