**STATE**

v.

**Marta ORTIZ.**

No. 79–138–C.A.

Supreme Court of Rhode Island.

Aug. 5, 1982.

Reargument Denied Sept. 9, 1982.

Dennis J. Roberts, II, Atty. Gen., Sharon O'Keefe, Sp. Asst. Atty. Gen., Joel Landry, Asst. Atty. Gen., Anthony DelBonis, Sp. Asst. Atty. Gen., for plaintiff.

William F. Reilly, Public Defender, Barbara Hurst, Chief Appellate Atty., Paula Rosin, Asst. Public Defender, for defendant.

## OPINION

MURRAY, Justice.

On October 31, 1978, a Superior Court jury found the defendant, Marta I. Ortiz, guilty of first-degree murder. The defendant is now before this court on appeal from the judgment of conviction entered on that verdict.

At about 1 a.m. on May 17, 1978, Officer Russell F. Pion of the Central Falls police department heard a woman screaming and the sounds of breaking glass. When Officer Pion arrived at the tenement building from which the sounds had originated, he was joined by Officer Michael J. White. Officer Pion entered the building first and saw defendant, accompanied by her young daughter, coming down the stairs. When defendant saw Officer Pion she said, "God forgive me. I have just killed my son." When Officer White entered the building and asked defendant what had happened, she replied, "I killed my baby."

Officer White then checked defendant's apartment and found the blood-covered body of Noel Seaman, defendant's seven-year-old son, in one of the bedrooms. The subsequent autopsy by the medical examiner revealed that the child had been stabbed five times and that the fatal wound had been through the heart.

The defendant was taken to the police cruiser where Officer Pion read the *Miranda* rights to her in English. The defendant responded in English that she understood her rights. However, when defendant arrived at the Central Falls police station, she persisted in speaking only in Spanish. Accordingly, an interpreter employed by the police was summoned.

The interpreter translated the *Miranda* rights into Spanish and witnessed defendant signing the waiver-of-rights form. The defendant then gave the interpreter an oral statement in which she claimed that God had instructed her to kill her son.

We shall address first defendant's claim that the trial justice committed reversible error in finding her competent to stand trial. At the pre-trial competency hearing, the state presented one witness, Dr. Ronald Stewart, a forensic psychiatrist at the Institute of Mental Health who examined defendant the day before trial in order to determine her competency to stand trial. Doctor Stewart testified that he had determined that defendant understood the charges against her and that she was aware of and understood the roles of the judge, the prosecutor, and the defense counsel.

The defendant stresses the portion of Dr. Stewart's testimony which related that defendant did "not completely" remember killing her son. The defendant had also told Dr. Stewart that she did not understand everything that her attorney said. However, defendant did tell Dr. Stewart that an interpreter had been provided for her and that she did understand everything that the interpreter said.

In support of her assertion of incompetency, defendant introduced a letter from Dr. Bruno Franek, stating that he had examined defendant and had concluded that she was not competent to stand trial. This statement was dated September 14, 1978—more than one month before the trial.

The standard to be used in determining competency to stand trial was set forth by this court in *State v. Cook*, 104 R.I. 442, 447–48, 244 A.2d 833, 835–36 (1968):

"[I]n order for a court to permit a defendant to be tried three things must be found: first, that defendant understands the nature of the charges brought against him; second, that defendant appreciates the purpose and object of the trial proceedings based thereon; and third, that

defendant has the mental capacity to assist reasonably and rationally his counsel in preparing and putting forth a defense to the criminal charges of which he stands accused. If the answer to all three of the preceding tests is affirmative, then the defendant is mentally capable for purposes of a trial and should be given a timely opportunity to proceed to a trial. When a trial justice in this state has presided over a hearing of this nature and rendered a decision on the defendant's fitness for trial in compliance with the relevant law on competency set out above, his decision is entitled to great weight and will not be disturbed by us unless it is shown that he clearly abused his discretion in making his determination." [Citations omitted.]

A review of the transcript of the competency hearing discloses that the trial justice made the proper findings in light of *Cook* and his ruling will not be disturbed by this court. *See State v. Cook*, 104 R.I. at 448, 244 A.2d at 836.

The next issue raised by defendant challenges the instruction given by the trial justice on voluntary intoxication.[1] The defendant specifically objects to the fact that the trial justice did not instruct the jury that the state had the burden of proving, beyond a reasonable doubt, that defendant was not so intoxicated that she was unable to have the specific intent to kill. In support of this argument defendant cites *State v. McGehearty*, R.I., 394 A.2d 1348 (1978) in which this court reversed a conviction for robbery on the ground that the trial justice had erroneously charged the jury that the defendant had the burden of proof on the defense of voluntary intoxication.

1. In *State v. McGehearty*, R.I., 394 A.2d 1348, 1351 (1978), we reviewed an alleged error, notwithstanding a defendant's failure to make a timely objection at trial, because a basic constitutional right was involved. In the case before us, however, we need not reach this question. As we noted in *State v. Pope*, R.I., 414 A.2d 781, 786–87 (1980), at the time *McGehearty* was tried "there was some confusion as to the exact impact of the rule in *Mullaney v. Wilbur* * * * on Rhode Island's long-standing require-

ment that intoxication was an affirmative defense." [Citations omitted.] Although the proceedings in the instant case concluded on November 10, 1978—less than a month before our opinion in *McGehearty* was filed—there was no uncertainty in the law at that time that the defense of voluntary intoxication initially must be raised by the defendant. *See also State v. Amado*, R.I., 433 A.2d 233, 241 (1981) (Mr. Justice Weisberger concurring).

An examination of *McGehearty* reveals that its holding is inapposite to the instant case. The defendant in *McGehearty* had introduced evidence that he had consumed fifteen bottles of beer and a substantial amount of whisky during the nine hours preceding the robbery. This was decidedly a crucial factor, for this court found that it was "*because of the evidence defendant presented on the issue of intoxication* [that] * * * the trial justice should have instructed the jury that the state was required to prove, beyond a reasonable doubt, that defendant was not so intoxicated as to be unable to harbor a specific intention to steal." (Emphasis added.) *State v. McGehearty*, 394 A.2d at 1351. *See State v. Vanasse*, 42 R.I. 278, 281, 107 A. 85, 86 (1919) (holding that in order to negate specific intent intoxication must be of "such a degree as to completely paralyze the will of the respondent, take from him the power to withstand evil impulses and render his mind incapable of forming any sane design").

The importance of a defendant's initial burden in raising the issue of voluntary intoxication is even more clearly stated in our conclusion in *State v. McGehearty*, 394 A.2d at 1353

"*once the defendant satisfied the burden of going forward with sufficient evidence to justify the existence of doubt* on the issue of whether his intoxication was such as to negate his specific intent, it became the state's burden to establish that he was not so intoxicated by proof beyond a reasonable doubt." (Emphasis added.)

■ In the case before us, defendant's confusing and often equivocal testimony on this point consistently indicated only that she had smoked an unspecified amount of marijuana, possibly mixed with Angel Dust (PCP), the evening before her son's death.[2]

Such a minimal showing hardly satisfies "the burden of going forward with sufficient evidence" as described in *McGehearty*. Since the issue of voluntary intoxication was not properly raised at trial, we cannot find that the trial justice committed reversible error in failing to specify in his instruction who would carry the burden of proof on that issue.

The next issue raised by defendant is two-fold. Doctor Bruno Franek, a psychiatrist called as a defense witness, examined defendant on September 14, 1978, for the purpose of determining her sanity. The trial justice allowed Dr. Franek to testify about the questions he had posed to defendant in the course of a one-hour examination, but he would not permit testimony about defendant's responses. After determining that Dr. Franek had examined defendant solely for the purpose of testifying, the trial justice also refused to permit testi-

2. On cross-examination, defendant was questioned several times about her ingestion of intoxicants just prior to her son's death. Her responses were at times contradictory.

"Q. Now, on Tuesday, the day before the morning of your son's death, did you take any Orange Sunshine?
A. No, sir.
Q. Did you smoke any marijuana?
A. Yes.
Q. Did you take any other drug?
A. I don't remember.
Q. Did you drop any acid?
A. I was still in the drug; there was still on me.
       *     *     *     *     *     *
Q. Now, on the Tuesday, the night before you stabbed your son, how much marijuana had you smoked?
A. I don't know.
Q. Did anybody force you to smoke the marijuana?
A. No.

       *     *     *     *     *     *
Q. Now, I will ask you once again, on that Tuesday, did you drop any acid?
A. No, sir.
Q. Did you take any Orange Sunshine?
A. No, sir.
Q. Did you take any PCP?
A. I don't remember that Tuesday. I remember I was still in the drug. I was very disturbed.
       *     *     *     *     *     *
Q. How much Orange Sunshine did you take on the Tuesday, the night before you stabbed your son?
A. About half of one.
       *     *     *     *     *     *
Q. What did you smoke?
A. Marijuana.
Q. Was there anything mixed with the marijuana?
A. I don't know.
Q. You smoking Angel Dust?
A. Yes. It was with the marijuana."

mony on the direct question of defendant's sanity. Doctor Franek was, however, permitted to state his opinion on sanity in response to a hypothetical question based on evidence that had been presented at trial. The defendant claims that these restrictions on the testimony of her psychiatric witness constitute reversible error. We disagree.

In support of her argument that Dr. Franek should have been allowed to testify to her responses to his questions, defendant directs our attention to *State v. Johnson*, R.I., 383 A.2d 1012, 1021 (1978). In that case we held that the trial justice did not err in permitting the testimony of a psychiatric examiner which included inculpatory statements made by the accused in the course of a compelled submission to a psychiatric examination. The defendant in the instant case argues that she should have been permitted the same testimonial latitude as that accorded to the state in *Johnson*.

■ The defendant's argument on this point fails to account for the reasons supporting our holding in *Johnson*. In that case we explicitly recognized that admission of the inculpatory statements would have been improper if they were intended to prove the accused's guilt. *State v. Johnson*, 383 A.2d at 1021. The contested statements were admissible *only* for the purpose of disclosing the information upon which the psychiatrist had based his opinion. *Id.* In the case before us, the trial justice disallowed testimony as to defendant's responses on the ground that he would "not permit any statements to be made that [would] be self-serving." However, by allowing Dr. Franek to testify at length about the exact questions he had posed to defendant, the trial justice recognized the legitimate goal of explaining the basis of the witness's opinion.

■ Ultimately, however, Dr. Franek was not permitted to voice his opinion of defendant's sanity. When the trial justice

determined that Dr. Franek had examined defendant for the purpose of testimony— not treatment—he ruled that the witness could only render an opinion in response to a hypothetical question. Notwithstanding defendant's arguments to the contrary, we find no error in this ruling.

In *State v. Fogarty*, R.I., 433 A.2d 972, 977 (1981), we discussed at length

"the familiar rule that although a treating physician may give his opinion positively and directly, rather than in the muffled abstract form of an answer based upon an hypothesis, a forensic expert who has not treated the patient may not give an opinion on the basis of reports and information gained from third parties."

We noted in *Fogarty* the many failings of this rule, but we did not, as defendant states in her brief, reject the old rule.[3] Our ruling on this issue in *Fogarty* applies with equal force to the instant case: "However vehemently Wigmore may have opposed this principle, * * * the trial justice was entitled to rely upon it. We cannot say that in the absence of our explicitly enunciating a new rule, the trial justice committed an abuse of discretion in following the apparent directions of this court." *State v. Fogarty*, 433 A.2d at 978.

The defendant next asserts that the state failed to prove by clear and convincing evidence that her confession was the result of a voluntary and knowing waiver of her rights.

The defendant argues that she was too confused and emotionally distraught to understand and knowingly waive her right to counsel and her right to remain silent.

■ In order for a confession to be deemed voluntary, the state must show by clear and convincing evidence that the confession was the product of an accused's free and rational choice and not the result of coercion of any type. *State v. Fuentes*, R.I., 433 A.2d 184, 189 (1981); *State v.*

**3.** In *State v. Fogarty*, R.I., 433 A.2d 972, 978 n.3 (1981), we observed that a committee of this court was considering the adoption of rules of evidence patterned upon the Federal Rules of Evidence. That committee has not yet made its final recommendations.

*Carlson,* R.I., 432 A.2d 676, 679 (1981). In making this determination it is important to consider the attendant circumstances including the conduct of the police. *See State v. Amado,* R.I., 424 A.2d 1057, 1062 (1981); *State v. Bello,* R.I., 417 A.2d 902, 904 (1980). In reviewing the claim, we will only revise the finding of the trial justice if, after reviewing the evidence, we are convinced that the ruling was clearly erroneous. *State v. Fuentes,* 433 A.2d at 189.

■ The testimony of Detective J. Eugene Bricault reveals that defendant was undoubtedly very distressed while in custody at the Central Falls police station. However, the testimony of Iluminada Diaz (the police interpreter) also discloses that defendant was carefully advised of her rights in Spanish and in English. Before signing the waiver-of-rights form defendant indicated to Mrs. Diaz that she did not want an attorney and that she understood her rights. In view of this evidence, we do not find that the trial justice was mistaken in ruling that defendant's confession was knowingly and voluntarily made.

We must also reject defendant's next claim of error, which concerns the refusal by the trial justice to permit testimony about a computer-printout analysis of defendant's mental condition at the time of the offense.

In *Powers v. Carvalho,* 109 R.I. 120, 126, 281 A.2d 298, 301 (1971), this court clearly stated that evidence of scientific tests is admissible only if a foundation has been laid which establishes the test as reliable in the relevant scientific fields of endeavor.

■ In her offer of proof, defendant relied on the testimony of Dr. John Karkalas, a psychiatrist at the State Institute of Mental Health, who had examined defendant. Doctor Karkalas described how the information about the patient was recorded and fed to a computer, which then analyzed the data. Although Dr. Karkalas considered the computer analysis to be accurate, no other evidence was presented to establish the accuracy and reliability of this form of testing. In light of the standard enunciat-

ed in *Powers,* we do not find that the trial justice erred in ruling that a proper foundation had not been laid.

The final issue raised by defendant challenges the trial justice's refusal to admit into evidence certain medical records from Miriam Hospital, Pawtucket Memorial Hospital, and the Institute of Mental Health. The defendant argues that, in keeping with *State v. Jamgochian,* 109 R.I. 46, 50, 280 A.2d 320, 323 (1971), the proper foundation was established for these records as records kept in the ordinary course of hospital business and that the admission of these records was vital to buttressing defendant's claim of psychological disturbance.

■ Insofar as they relate to the elements of business-record foundation, we agree with the defendant's arguments on this point. However, the defendant's claim fails to overcome an even greater obstacle—that of relevancy. Before the jury was selected, the hospital records were admitted for identification purposes only, and there was no indication at that time of the type, content, or import of those records. Moreover, the defendant's later motion that the records be admitted as full exhibits was unaccompanied by an offer of proof establishing their relevance. Since no attempt was made to establish the relevance of the hospital records to the issue of the defendant's criminal responsibility, we cannot fault the trial justice for refusing to admit them as full exhibits.

The defendant's appeal is denied and dismissed. The judgment of conviction appealed from is affirmed, and the case is remanded to the Superior Court.